LOUISIANA ENVIRONMENTAL
SOCIETY, INC., et al.,
Plaintiffs-Appellants,

v.

William T. COLEMAN, Secretary,
Department of Transportation, et
al., Defendants-Appellees.

No. 74–3087.

United States Court of Appeals,
Fifth Circuit.

Nov. 28, 1975.

Billy R. Pesnell, Shreveport, La., for plaintiffs-appellants.

Donald E. Walter, U. S. Atty., Shreveport, La., Norman L. Sisson, Robert J. Jones, Baton Rouge, La., Charles Biblowit, Wallace H. Johnson, George R. Hyde, Larry G. Gutterridge, Dept. of Justice, Washington, D. C., Sharon P. Frazier, La. Dept. of Hwys., Baton Rouge, La., for defendants-appellees.

Before COLEMAN, CLARK and GEE, Circuit Judges.

CLARK, Circuit Judge:

The Louisiana Environmental Society (LES) appeals from the denial of preliminary injunctive relief to halt the construction of the Interstate 220 bypass highway around Shreveport, Louisiana. Based upon a full opinion dealing with every issue raised, the district court denied the motion for preliminary injunction after determining that LES had failed to demonstrate a substantial likelihood it would prevail on the merits.[1] The court's ruling that the Secretary of Transportation had correctly complied with § 4(f) of the Department of Transportation Act[2] raises a serious question which we pretermit here because the record establishes that LES failed to carry its burden of proving irreparable injury would occur absent injunctive relief. The denial of the preliminary injunction is affirmed.

Before this court can determine that the denial of a preliminary injunction amounts to an abuse of the trial court's discretion, it must be determined that the proponent of such relief has met the high threshold burden of proving "(1) a substantial likelihood that [he] will prevail on the merits, (2) a substantial threat that [he] will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to [him] outweighs the threatened harm the injunction may do to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest." *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974).

The planned bypass highway at the center of this controversy is a 17.6-mile segment of a four-lane, limited-access interstate roadway designed to alleviate traffic congestion in the Shreveport area. The route adopted by the Secretary requires a 10,225-foot bridge over Cross Lake. This lake serves as the main water supply for the City of Shreveport and also constitutes a valuable public recreational area.

LES mounted a four-pronged environmental attack on the I–220 bridging of Cross Lake. First, the proposed construction of the highway violates section 4(f) of the Department of Transportation Act because Secretary Brinegar could not reasonably have found that there were no prudent, feasible alternatives or that all possible planning had been done to minimize harm, and his determinations that both prerequisites existed were arbitrary and capricious. Second, the construction of the highway does not comply with the National Environmental Policy Act[3] because full disclosure was not made and the environmental impact statement was insufficient. Third, 23 U.S.C. § 128(a) and recent administrative

---

1. The district court's opinion reads as if it were a final decision on the merits. However, we do not review it as such since the court expressly articulated preliminary injunction standards as the basis for its review and no consolidation order was entered under Fed.R. Civ.P. 65(a)(2).

2. 49 U.S.C. § 1653(f).

3. 42 U.S.C. § 4332.

regulations require additional public hearings before construction on this highway may proceed. Finally, the highway violates 23 U.S.C. § 134 since it is not based on a continuing comprehensive transportation planning process.

Without intending to intimate any view as to the last three issues raised, we conclude that the significance of the first issue to the future history of this litigation warrants discussion now. Under section 4(f) the Secretary of Transportation is required *not* to approve a highway project which uses a recreational area *unless* (1) there is no "feasible and prudent alternative," and then only if (2) the project "includes all possible planning to minimize harm." [4]

The administrative record before the Secretary at the time of his decision was the most pertinent material before the district court. That record discloses that west of the Red River five alternatives to the chosen route were considered. The Secretary rejected all of these alternatives, finding them to be feasible but not prudent.

The bypass location around Cross Lake which LES claims should not have been rejected was alternative "C." The final 4(f) statement considered by Secretary Brinegar noted the following adverse effects in rejecting alternative route "C": It would present a visual obstruction to numerous inhabitants along the eastern perimeter of the Lake. It would require traversing two small pockets of the Lake (this intrusion was found to have negligible impact on the function and uses of the Lake). Approximately 160 family and individual household units, 24 businesses, and 1 nonprofit organization would be displaced. Right-of-way costs were estimated at approximately 18,000,-000 dollars.[5] The route traverses land which would be available for development.[6]

On the positive side, the final statement found that alternative "C" would be less damaging to wildlife than the route chosen, and that part of its path would be through an oil field and through low lands subject to occasional flooding, having less potential for future development than some of the property to be taken by the route selected. Adequate replacement housing would be available in the project area. The cost of this route was estimated to be 33,600,-000 dollars as compared to an estimated cost for the route adopted of 36,110,000 dollars.

The statement concludes that property damages, displacements and resulting high right-of-way costs indicated the alternative was not prudent. The Secretary did not mention that he has studied the feasibility of utilizing for alternate "C" the Red River bridge as it is now planned and a substantial portion of the right-of-way already acquired on the west side of the Red River, nor has he studied means of minimizing residential displacements along the east end of Cross Lake by moving the alignment south and east of the line proposed after crossing City Pocket and by rejoining the approved route north of Jefferson-Page Road. Both alterations appear to offer maximum use of already acquired right-of-way and minimum displacements.

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court has fixed the meaning of the pivotal term "prudent" for purposes of judicial review of the Secretary's action.

4. 49 U.S.C. § 1653(f).

5. Approximately 80% of the total right-of-way for the approved route has already been acquired. Remaining acquisitions needed for that route will cost 1,215,000 dollars and will involve only eight household and two commercial displacements.

6. The statement also noted that the west terminus of the route would not align with a proposed interloop bypass to be constructed south of I-20 and west of the Shreveport airport. However, the Secretary stated that no studies had been made of this "terminus" problem and that he recognized the difficulty could be mitigated by tying alternative "C" to the end of the route adopted at a point south of the Lake and north of I-20.

Congress clearly did not intend that costs and disruption of the community were to be ignored by the Secretary. But the *very existence of the statutes* indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were *truly unusual factors* present in a particular case or the cost of community disruption resulting from alternative routes reached *extraordinary magnitudes.* If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds the alternative routes present *unique* problems.

401 U.S. at 412, 413, 91 S.Ct. at 821, 822 (emphasis added).[7]

■ Neither the Secretary nor the district court articulated the use of disparate weighting of values which *Overton Park* prescribes as controlling a choice to take parkland for highway use. *Overton Park* sharply refuses to allow a choice between the use of recreational lands and the use of any feasible nonintrusive alternative to be made as one between equal values. The community disruption and increased costs resulting from the use of alternative route "C," which has only negligible effect on the Lake, must reach "extraordinary magnitudes," and the use of an alternative similar to "C" must present "unique problems" before it can be rejected in favor of bridging Cross Lake. Although we decline to reach the district judge's approval of the Secretary's 4(f) choice at the preliminary injunction stage, our refusal to deal with the issue should not be taken to predict any decision when the matter is heard on its merits. We say no more than that our present review is limited—very lim-

ited—and the affirmance is more confidently placed on other grounds.

■ The district court did not find it necessary to decide whether a showing of irreparable injury had been made. However, the record reveals that LES failed to carry its burden of proving that prerequisite existed here. Bids will not be let on the Cross Lake bridge route approved by the Secretary until September 1976 and no construction directly affecting the Lake is planned to begin until after that date, thus no immediate harm to Cross Lake is threatened. LES contends that the letting of bids for a portion of the highway north and east of Cross Lake will so lock in a bridging of the Lake as to eliminate alternatives to the adopted plan. These bids are not scheduled to be opened until December 30, 1975. This is a sufficient period of time to enable the district court to act either on the merits or, through some temporary order, to protect the viability of alternatives until the merits can be reached.

■ LES asserts they are being irreparably injured because the government has made purchases of right-of-way. We reject this assertion on two grounds. First, the harm which the injunction sought to prevent was the improper utilization of recreational areas for highway purposes. That is not involved in such right-of-way purchases. Second, assuming plaintiffs have standing to assert personal loss from improper acquisition of right-of-way, plaintiffs have not shown that if divestiture becomes necessary the acquisitions will constitute an unsaleable asset.[8] LES failed to demonstrate that any injury it will suffer is irreparable. The judgment appealed from is

Affirmed.

7. As the district court correctly noted, the ultimate standard for its searching and careful review of the Secretary's actions is not what the court's judgment would have been had it decided the issue, but whether the Secretary failed to consider the relevant factors or was guilty of a clear error of judgment.

8. We do note that the 4(f) statement asserts that the recovery of public funds expended for

this purpose will be "exceedingly difficult." Even if the court had accepted this bare assertion, the potential of losses to the fisc would have properly been weighed as part of the public injury factor in the preliminary injunction equation. We recognize that further factual development might make its impact on the merits different.