**LOUISIANA ENVIRONMENTAL SOCIETY, INC. and Mrs. Vernon B. Chance, Sr.**

v.

**Claude S. BRINEGAR, Secretary, Department of Transportation, and Department of Highways, State of Louisiana.**

Civ. A. No. 17233.

United States District Court, W. D. Louisiana, Shreveport Division.

Jan. 28, 1976.

Billy R. Pesnell, Shreveport, La., for plaintiffs.

Robert J. Jones, Sharon Frazier, Baton Rouge, La., Donald E. Walter, U. S. Atty., L. H. Harris, Asst. U. S. Atty., Shreveport, La., Jean Rogers, Regional Counsel, Federal Highway Administration, Fort Worth, Tex., for defendants.

EDWIN F. HUNTER, Jr., Chief Judge:[1]

This case was tried on the merits January 7–9, 1976, after the Fifth Circuit Court of Appeals affirmed the judgment of this Court denying plaintiffs' Motion for a Preliminary Injunction. 524 F.2d 930 (5th Cir., 1975). The opponents,[2] in an exceptionally able manner and with painstaking thoroughness, mount a four-pronged attack on the I–220 bridging of Cross Lake:

1. Whether defendants are required to hold a new public hearing or additional public hearings with respect to the proposed I–220 By-Pass in accordance with 23 U.S.C. § 128(a), as amended, and in accordance with PPM 20–8.

---

1. By memorandum ruling of January 23, 1976, we declined to enjoin permanently or otherwise Project I–220–1(53)17, which does not traverse Cross Lake.

2. The plaintiffs are LES, a local private corporation, and Mrs. Vernon B. Chance, Sr.

2. Whether the proposed I–220 By-Pass is based on a continuing comprehensive transportation planning process as required by 23 U.S.C. § 134.

3. Whether defendants have complied with the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2), in connection with the proposed I–220 By-Pass, a major federal action significantly affecting the quality of the human environment.

4. Whether the decision of the Secretary of Transportation purporting to approve the bridging of Cross Lake for the construction of the proposed I–220 By-Pass, a federal-aid highway project, under the provisions of Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f), and 23 U.S.C. § 138, is in excess of his statutory authority, arbitrary and capricious, or otherwise invalid.

These issues have been canvassed, both as to the facts and the applicable law, in an earlier opinion. Much of what is said here will be repetitious. We are indebted to the Court of Appeals for its emphasis on the significance of the 4(f) statement to the future of this litigation. We shall endeavor to articulate anew that facet of the case.

## THE FEDERAL–AID HIGHWAY PROGRAM

The Federal Highway Administration, with a few minor exceptions not relevant here, does not build roads. It administers a grant-in-aid program to assist states which build roads. The federal interest in a nationally integrated system of highways meeting specified construction standards is achieved through the process of detailed continuing review of state proposals for federal assistance. Each step in the development of a particular highway consists of a state request for approval and federal response.

The federal-aid program is divided into "Systems" which are similar but with some distinguishing features, notably the percentage of federal financial participation. Best known of these is the Interstate System. The I–220 Route here involved is a part of the Interstate System. 23 U.S.C. § 103(d).

A particular highway begins as a state proposal for inclusion of a link in a system. In making this proposal the state is merely asking, in effect, for an account to be opened for reimbursement of later work. The system designation is very general in terms as to location, level of traffic service, schedule of construction and other considerations which must be resolved before the highway is built. Federal approval of the system designation does not commit any federal funds for construction. It is merely an essential prerequisite to later commitments when specific details have been decided.

Beyond the complexities of the strictly engineering problems of highway construction, two additional factors further complicate the process: the length of time required to plan and construct a highway, and the inherent disruption from highway construction, particularly in an urban context. These two factors have led to an overlay of additional procedures relevant to this case. The time factor has led to the subdivision of the work to be done into smaller increments which can be financed and performed within the planning priorities of the state and federal governments. Hence, a length of highway which may have received system approval as a unit may at a later time be in a location study stage in one part, a design stage in another part, a right-of-way acquisition stage in another part, and a construction stage in still another part.

The time factor, and the resulting segmentation of work, have required the creation of a supervening planning process of a continuing character to attempt to coordinate the development of transportation facilities. Known as the "3C" process, this planning function is ordinarily carried on by an agency separate from either the state highway department or the Federal Highway Adminis-

tration. For the I–220 Route the 3C agency is the Shreveport-Bossier Metropolitan Council of Governments.

Prior to 1968, federal law, 23 U.S.C. § 128, required a state highway department to hold a public hearing to obtain comments from the public on the economic effects of a proposed highway. The hearing was held at the conclusion of the study of location alternatives. The 1968 Highway Act expanded the matters to be considered in the public hearing to include social and environmental effects. The statute on its face does not require more than one hearing. But the implementation of the 1968 Highway Act by the Federal Highway Administration in its Policy and Procedure Memorandum (PPM) 20–8 recognized that a more elaborate procedure was required. Two hearings are now held, one at the location stage and one at the design stage. The first is called a corridor hearing and the second is called a design hearing. PPM 20–8 specifically provides, however, that where location approval had been sought prior to the new procedure a new location hearing would not be required. The same "grandfather" provision is included with respect to design approval.

In the highway area the draft EIS is ordinarily a part of the preparation for the location public hearing. This ordinary procedure breaks down with respect to those projects which were begun prior to NEPA so as to have progressed beyond the location hearing stage at the time the EIS is prepared.

### STANDARD OF REVIEW

██ The standard of review by which the district court is governed is found in § 706, which provides that a

"reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found" not to meet six separate standards.[3] In all cases, agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. § 706(2)(A), (B), (C) and (D). According to *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Court is required to: (1) decide whether the Secretary acted within the scope of his authority; (2) whether the choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (3) whether the secretary's action followed the necessary procedural requirements. While "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." The Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. The focal point of review is the administrative record already in existence. *Camp v. Pitts*, 411 U.S. 138 at 142, 93 S.Ct. 1241, 36 L.Ed.2d 106. However, the Court of Appeals' decision of November 28, 1975 suggests further factual development might be appropriate. Accordingly, litigants were permitted to supplement the record with testimony and exhibits in open court on January 7, 8 and 9th. Our decision is based primarily on the administrative record and reference will be made to any supplements.

---

**3.** Agency action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

## PUBLIC HEARINGS

Plaintiffs allege that no public hearing has been held with respect to the proposed project in accordance with the requirements of 23 U.S.C. § 128(a) [4] and the requirements of PPM 20–8 (Policy and Procedure Memorandum of the Department of Transportation, January 14, 1969). Regulations prepared by the FHWA pursuant to § 128(a) require that the State Highway authorities hold two sets of hearings: (1) a "corridor public hearing" must be held before the state authorities to select a proposed route location for submission to the FHWA for approval. The purpose of this hearing is to insure public participation "in the process for determining the need for, the location of, a Federal-aid highway." PPM 20–8, Para. 4(a); (2) a "highway design public hearing" must be held after the FHWA has approved the route location, but before the state authorities have selected a specific design proposal for submission to the FHWA for design approval. The purpose of this hearing is to insure public participation "in the process of determining the specific location and major design features of a Federal-aid highway." PPM 20–8, Para. 4(b). *Keith v. Volpe,* 352 F.Supp. 1324, 1338 (C.D.Cal.1972).

The State defendant provided two hearings. On December 15, 1964, the first public hearing was held in the Caddo Parish Courthouse. A second public hearing was held on May 2, 1967, on the proposed relocation of the east terminus of I–220. On February 25, 1965, the Bureau of Public Roads (BPR) gave location approval of the route along line "B" as modified by line "E" (see map), after proper certification that the economic effects of the different possible locations

had been considered. On June 9, 1967, BPR similarly approved the relocation of the east terminus. Plaintiffs allege that a new public hearing is necessitated because there have been significant changes in route and design of the project since the first public hearing. Those changes include: (1) re-location of the western terminus; (2) modification of the route over Cross Lake; (3) re-design of the drainage system of the bridge over Cross Lake. The controlling regulations in effect at the time the initial public hearings were held provided, *inter alia,* that the purpose of the hearing is to aid the State in making final decision as to which of several feasible detailed locations should be selected, PPM 20–8, Para. 2(c) (1959). More specifically, Para. 3(b) provided that the highway department must

> " * * * fully inform the public concerning the *general location and design features,* and the general economic and other aspects of the proposed improvements, together with possible alternate routes, all in sufficient detail to permit residents of the area to have full and reliable information as to the project." (emphasis added)

*See Ward v. Ackroyd,* 344 F.Supp. 1202, 1218–19 (D.Md.1972). The transcript of the December 15, 1964 public hearings reveals that the route changes subsequently made (change of western terminus, modification of route over Cross Lake) were described and defined in the "Corridor." [5] Conversely, the eastern terminus was relocated completely outside of the area demonstrated to the public hearing of December 15, 1964. Thus, a new public hearing was held.

■ Because a new drainage system was incorporated into the bridge, plain-

---

4. "Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, either incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the

goals and objectives of such urban planning as has been promulgated by the community."

5. *Ward v. Ackroyd,* 344 F.Supp. 1202, 1219 (D.Md.1972): "There seems to be an apparent agreement that it [Corridor] means a broad band of land of generally similar characteristics within which a particular highway may be located."

tiffs urge that new hearings were necessitated. We do not agree. The drainage of the bridge is not such a "major design change" of the entire project, a 17-mile, 2-parish circumferential route around Bossier City and Shreveport. We agree with defendant that the "only change which is being effected is a change which is routinely incorporated into segments of interstate highways through municipalities.[6]

 In addition, plaintiffs would have us order an *expanded* public hearing, because of changes in the applicable legislation. When the hearings were held in 1964 and 1967, § 128(a) of the Federal-aid Highway Act, 23 U.S.C. § 128(a), required only that the hearing seek information to aid in the consideration of the *economic* effects of that location. In 1968, § 128(a) was amended to require that the hearings consider not only economic effects, but also the *social* and *environmental* effects of the proposed highway project. It was further amended in 1970 to require state highway departments to file a report with the Secretary of Transportation indicating the consideration given by it to the social, economic, environmental, and other effects of a planned highway. Plaintiff cites several decisions which have applied the amended statute retroactively, the most important being *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693 (2d Cir., 1972) and *Arlington Coalition on Transportation v. Volpe,* 458 F.2d 1323 (4th Cir.), cert. denied, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). Significantly, however, in both cases an environmental impact statement had *not* been compiled. Both courts ordered that an EIS be made. In *Monroe County* e. g., the Court felt that such an expanded hearing would be "most valuable in aiding the agency in its preparation of the impact statement which we have today held is required by NEPA." 472 F.2d at 702. *In our case, a final EIS as well as*

a *supplemental EIS were submitted.* The environmental effects were considered in depth. Moreover, there have been cases holding *contra* to *Monroe County* and *Arlington Coalition.* In *Township of Hopewell v. Volpe,* 446 F.2d 167, 172 (3d Cir., 1971), the Court refused to apply § 128(a) retroactively:

"To do this [apply the Amendment retroactively] would be inconsistent with the purpose of the act which reads, 'It is hereby declared that the prompt and early completion of the National System of Interstate and Defense Highways, so named because of its importance to the national defense and hereafter referred to as the "Interstate System" is essential to the national interest and is one of the most important objectives.' (23 U.S.C. § 101(b)). If we were to apply Section 128(a) as amended we certainly would not be implementing 'prompt completion' of the system, in fact it would be detrimental to the objective of an early completion. Had Congress intended that the amendment had a retroactive effect, that purpose of course would have been clearly shown in the amendment itself. There is no language in the 1968 amendment which could in any way be twisted to indicate that it is to function retroactively. Nor did the court in *Triangle Improvement Council v. Ritchie,* the key decision on this particular query, have the slightest doubt that the 1968 amendment should not be applied retroactively. Chief Judge Field stated 'I am further convinced, after analyzing the statutory provisions, their legislative history, and the instructional memoranda issued pursuant thereto, that Congress could not have intended that projects authorized and approved several years prior to the enactment of the 1968 statute were to be subject to inflexible and strict compliance therewith. The administrative agency did not give it such an interpretation, and I am of

---

**6.** A suit instituted in 1971 complaining of lack of a third hearing five years earlier is not time-

ly. Besides, it does not affect the bridging of Cross Lake.

the opinion that the agency's determination had a rational basis and should not be disturbed.' *Triangle Improvement Council v. Ritchie,* 314 F.Supp. 20, 30 (S.D.W.Va.1969), affirmed on opinion below, 429 F.2d 423 (4 Cir. 1970), certiorari dismissed as improvidently granted 402 U.S. 497, 91 S.Ct. 1650, 29 L.Ed.2d 61."

We find that the hearings in 1964 and 1967 were adequate.

## COMPREHENSIVE TRANSPORTATION PLANNING PROCESS

23 U.S.C. § 134 provides:

"After July 1, 1965, the Secretary shall not approve under section 105 of this title any program for projects in any urban area of more than fifty thousand population unless he finds that such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section. No highway project may be constructed in any urban area of fifty thousand population or more unless the responsible public officials of such urban area in which the project is located have been consulted and their views considered with respect to the corridor, the location and the design of the project."

■ Plaintiffs allege that the project was not properly "based on a continuing, comprehensive transportation planning process carried on cooperatively by the Louisiana Department of Highways and the City of Shreveport and Caddo Parish Police Jury" as required by the statute. They suggest that the local authorities had "no voice" in the planning and that it was presented to the City of Shreveport and the Caddo Parish Police Jury on a "take it or leave it" basis.

The record fails to support this allegation. On August 11, 1964, the Bossier Parish Police Jury approved line "B" as the location of I–220. The City Council of Shreveport took similar action on November 10, 1964. Also, in 1964, the LDH entered into agreements with the cities of Shreveport and Bossier City and the parishes of Caddo and Bossier to provide for the preparation of a comprehensive transportation plan for the Shreveport Metropolitan area. Additionally, Mr. Lane Mitchell, as representative of the Shreveport City Council, stated at the December 15, 1964 public hearing:

"[D]uring the past 25 years I have worked very closely with the engineers of the Highway Department and the Bureau of Public Roads * * *. [In] this particular case we have worked very closely with them and they have spent considerable time studying this problem." (Tr. p. 17).

Muriel Nash, Jr., Chairman of the Caddo Parish Road Committee reported at the hearing:

"The Police Jury approved and endorsed this recommended route, recommended by the Louisiana Department of Highways. We spent quite a bit of time on the various routes proposed and * * * we voted 15 for the proposed route, 4 against."

Mr. Nash then enunciated eight major factors that were considered at length by the jury. (Tr. pp. 20–21) Mr. Auld, President of the Jury, stated:

"Several months ago when the Police Jury and the City Council was first briefed on this thing, I was violently opposed to many parts of this new route. Since that time the State Highway Department has worked very closely, they have made many changes which was requested." (Tr. p. 22)

Clearly, the testimony of these local officials demonstrates that the Highway Department cooperated sufficiently with local authorities in the planning of this project. We find no violation of 23 U.S.C. § 134.

## THE ENVIRONMENTAL IMPACT STATEMENTS (EIS)

■ At the outset plaintiffs complain that the draft EIS was so vague, general, indefinite and conclusory as to virtually preclude reasonable and intelligent comment thereon by other agencies,

thereby depriving the public of their expertise. This bald conclusionary assertion in the absence of any supportive factual allegation is summarily rejected.

However, plaintiffs further complain with more specificity that the final EIS was illegally delegated to the Louisiana Highway Department (LHD); that defendants did not utilize an interdisciplinary approach in connection with the planning of the I–220 Route; that the final EIS is not objective but rather an *ex post facto* attempt to rationalize a decision already made by the LHD; and, that the final EIS is inadequate.

■ The preparation of the EIS was not illegally delegated to the LHD. The record will show that the EIS was prepared in consultation with state and federal agencies. Furthermore, the record is clear that the federal defendants did not merely rubber stamp the State's work, but rather initiated the EIS supplement. For example, the Introduction to the EIS Supplement clearly establishes that it was the federal defendants critical analysis which prompted the preparation of the Supplement.

■ The final EIS and Supplement contains ample references to show that an interdisciplinary approach was utilized in planning the I–220 Route. For instance the State Geologist, Leo W. Hough, prepared a report on the geological and hydrological aspects of Cross Lake; the Louisiana Wildlife and Fisheries Commission studied the impact on wildlife; the Louisiana Department of Health was consulted. In addition, the record will disclose many other disciplines which contributed to the planning of this project, indicating harmony with the requirements of NEPA. *Allison v. Froehlke*, 470 F.2d 1123 (5th Cir., 1972).

■ Specifically, plaintiffs allege that the final EIS is inadequate because:

(1) It lacked sufficient detailed information as to the design, construction, operation and maintenance of the closed drainage system of the bridge over Cross Lake.

Defendants respond that NEPA does not require that every conceivable study be performed and that each problem be documented from every angle. The closed drainage system is still in the design stage and the record will show the exhaustive planning being done by the LHD and the consulting engineers to minimize damage to the environment. Furthermore, as additional competent information is developed, it can be announced to the public. *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 5th Cir.; *Sierra Club v. Froehlke*, 345 F.Supp. 440 (D.C.Wis.).

(2) It failed to adequately discuss the noise levels in the vicinity of Cross Lake and fails to support its conclusions with respect to existing noise levels of anticipated traffic over Cross Lake.

Defendants refer to Exhibit E of the EIS Supplement entitled Noise Impact Study *made specifically for the Cross Lake Section* of the I–220 Route. This comprehensive study was based on noise criteria promulgated by the Federal Highway Administration and contained in the regulations as PPM 90–2. We find the noise impact study compiled by the State to be a sufficient treatment of the subject.

(3) It fails to adequately discuss air pollution resulting from traffic in the area of Cross Lake.

Similarly as with the previously mentioned allegation, defendants refer to Exhibit C of the EIS Supplement entitled "Air Pollution Study . . . (Cross Lake Section)" which is based upon standards of the Environmental Protection Agency. We further find the air pollution study to be adequate.

(4) It is factually inaccurate and misleading with respect to Caddo Lake as a potential source of water supply for Shreveport and Barksdale Air Force Base.

A review of the final EIS will show that it deals fairly with the development of Caddo Lake as a potential water supply for Shreveport and the Barksdale Air Force Base.

(5) It fails to provide sufficient factual information to permit a proper evaluation of alternate routes.

It is in the record that one of the federal defendants also recognized that the alternatives were not sufficiently detailed. Responsive thereto the supplemented final EIS was expanded to include traffic data as to trip types, tables showing travel time, assigned traffic volume, the re-build alternative and the partial completion alternative.

The final EIS does not provide any information with respect to the estimated or projected traffic volume for Alternate Alignment "C" because this alternate was considered as not reasonably available. The final EIS at page 25 states:

Construction of I–220 along Line "C" was determined to be feasible but not prudent based on the similar objections advanced for Alternate Lines "B" and "B–1," in addition to the substantial property damages and displacements involved, with resulting high rights-of-way costs.

Mass transit was not discussed in the EIS as an alternative for the reason that in the context of an on-going project and the purposes of I–220 Route such alternative is impractical, and not reasonably available. As stated in *Sierra Club v. Froehlke*, 359 F.Supp. 1289, the Court, with respect to alternatives on page 1069 stated:

While agencies must consider alternatives to the "fullest extent possible," the search for appropriate alternatives need be neither "exhaustive" nor speculative and remote. Although only those "reasonably available" need be considered, the discussion and consideration cannot be superficial, but must be thoroughly explored.

(6) It fails to sufficiently and adequately document the need for the proposed I–220 By-Pass or specifically identify the traffic needs to be served.

The short answer to this charge is that on pages 3 and 5 references are made to the transportation needs of the Shreve-port-Bossier City Metropolitan Area as defined in Chapter III of Volume II of the 1968 Shreveport-Bossier Plan and Transportation Study.

(7) It fails to adequately consider the possibility of the pollution or contamination of Cross Lake by the intrusion of salt water and for gas from strata underneath the bed of Cross Lake.

On page 15 of the final EIS the following language appears:

Also the "Geological and Hydrological Report of the Cross Lake Bridge Location, Shreveport I–220," by the Louisiana Geological Survey, Leo W. Hough, State Geologist, dated June 3, 1970, reveals that there is no contamination of Cross Lake by salt water, oil, gas, chemical mud, or any other pollutant by the drilling of test soils borings along the project. It is also the conclusion of this documented report that there is no possibility of polluting of the lake water by the construction of the I–220 project. Piling for the bridge will be driven into the sediments under the lake and no holes will be opened. The bridge pilage will penetrate into the upper regions of the Wilcox Group (sands) which underlies the lake. These sands are a fresh water aquifer (as determined by borings) which carry no pollutants and it is impossible for any water from these sands to pollute the lake.

This precise question was asked by plaintiffs in their response to the draft EIS. Plaintiffs received the following reply:

Reference is made to the detailed statements made under Section 3 of this Statement relative to this matter. The comprehensive "Geological and Hydrological Report for the Cross Lake Bridge Location, Shreveport I–220" dated June 3, 1970, by the Louisiana Geological Survey states that there will be no contamination of Cross Lake by salt water, oil, gas, chemical mud, or any other pollutant by the drilling of test soil borings along the project. * * * (p. 58, EIS)

## THE 4(f) STATEMENT

## OVERTON PARK
## CROSS LAKE[7]

23 U.S.C. § 138 and 49 U.S.C. § 1653(f) prohibit the secretary of transportation from approving any program or project which requires the use of any publicly owned land from a public park or similar area, or any land from an historic site of national, state, or local significance, unless (1) there is no feasible and prudent alternative to such use, and (2) the program includes all possible planning to minimize harm to the area resulting from such use.

Plaintiffs assert that the provisions of these statutes, for ease of reference called the 4(f) requirements, have not been met.

The Fifth Circuit (524 F.2d 930) noted:

The court's ruling that the Secretary of Transportation had correctly complied with § 4(f) of the Department of Transportation Act raises a serious question which we pretermit here * * *.

* * * * * *

Under section 4(f) the Secretary of Transportation is required *not* to approve a highway project which uses a recreational area *unless* (1) there is no "feasible and prudent alternative," and then only if (2) the project "includes all possible planning to minimize harm."

The administrative record before the Secretary at the time of his decision was the most pertinent material before the district court. That record discloses that west of the Red River five alternatives to the chosen route were considered. The Secretary rejected all of these alternatives, finding them to be feasible but not prudent.

7. The possibility of pollution of the water supply through traffic over the lake was a factor considered by both the City of Shreveport and the Department of Highways, which obviously found the possibility of danger so remote as to be inconsequential. *Hunter v. Shreveport*, 216 So.2d 140 (La.App.1968), writs refused 253 La.

The bypass location around Cross Lake which LES claims should not have been rejected was alternative "C." The final 4(f) statement considered by Secretary Brinegar noted the following adverse effects in rejecting alternative route "C": It would present a visual obstruction to numerous inhabitants along the eastern perimeter of the Lake. It would require traversing two small pockets of the Lake (this intrusion was found to have negligible impact on the function and uses of the Lake). Approximately 160 family and individual household units, 24 businesses, and 1 nonprofit organization would be displaced.

The Supreme Court of the United States, in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 413, 91 S.Ct. at 822 emphasizes:

The few green havens that are public parks were not to be lost <u>unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes.</u> If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems. (underscoring ours)

Could the Secretary have reasonably believed in this case (401 U.S. at 413, 91 S.Ct. 814) that there were "truly unusual factors?" Could he have reasonably believed that the alternate routes presented unique problems? Could he have reasonably believed that there was no substantial taking? An affirmative answer to any one of these interrogatories would, in our judgment, require dismissal of plaintiff's suit.

█ The Secretary did not articulate the use of disparate weighting of values

323, 217 So.2d 414. The Secretary came to the same conclusion (4(f) statements 15, 16, 44 and 58). Alternate Route "C" and Modified Route "C" cross the water in much closer proximity to the "water intake" and the "pumping station." See Department Exhibit 201—Orange and Yellow lines.

which Overton Park suggests as controlling a choice to take recreational land for highway use. Articulation is certainly not required. Formal findings—much less, articulation—are not required by either the Department of Transportation Act or the Federal Highway Act. *Overton Park,* 401 U.S. at 417–419, 91 S.Ct. 814. Department of Transportation regulations now require findings but not articulation. 35 F.R. 4247. The Secretary, appreciating his obligation, precisely concluded:

> It is our determination that there is no feasible and/or prudent alternative to the traversing of Cross Lake by this I–220 Interstate highway project (bridge). All possible planning and improvements to the alignment have been utilized by the designers to minimize harm such that the possibility of contamination or pollution of Cross Lake by this project has been rendered so remote or improbable as to be considered negligible and the full recreational use of the lake unencumbered by the proposed bridge through design and through construction procedures and specifications. The completion of the I–220 route will actually benefit the recreational usage of Cross Lake through the increased accessibility provided.

(4(f) statement, p. 43)

\*　　\*　　\*　　\*　　\*　　\*

The 10,225.6 foot four-lane I–220 bridge which is 86.6′ wide will cross the eastern end of Cross Lake with approximately 1000 acres of the lake east of the bridge, and the remaining 8,000 acres, west of the bridge.

(4(f) statement, p. 13)

The decision to prepare an EIS/4(f) statement, the contents thereof, the 4(f) determination that no feasible and prudent alternative existed, and the planning to minimize harm are, in this case, characterized by the direct involvement of Secretaries Volpe and Brinegar, and their immediate staffs. On June 2, 1970, Secretary Volpe determined that design and construction of the portion of I–220 east of U.S. 71, which does not affect the lake, should proceed but that construction of the portion which affects the lake should not be approved "until an adequate design is developed and agreed upon in writing" (a) to collect and discharge contaminants away from the lake, and to prevent vehicles from falling in the lake and (b) which will not interfere with the sailing activities and aesthetic features of the lake (Fed.Ex. 47). By memorandum of July 24, 1970, the General Counsel of the Department of Transportation advised the Secretary that [t]his approval is entirely consistent with our view that before the portion of the Bypass that affects the lake can be approved, Section 4(f) and the National Environmental Policy Act will have to be complied with" and that the State would have to resubmit that portion for the appropriate federal determinations before construction of it could proceed (Fed.App. 49). The Secretary was further informed (Fed.Ex. 50) that the requisite 4(f) findings and an EIS were not being prepared. Secretary Volpe, therefore, on August 4, 1970, directed that the State be advised to prepare an EIS and that a Section 4(f) determination would be necessary (Fed.Ex. 50). This was accomplished by letter of October 9, 1970, from the Division Engineer of the Bureau of Public Roads (hereinafter BPR) (now Federal Highway Administration (hereinafter FHWA)) to the Director of the Louisiana Department of Highways (hereinafter LDH) (Ex. P–17, p. 112, and Dept. No. 102). Subsequently on November 10, 1970, a draft EIS and Section 4(f) determination were submitted by LDH to BPR (Ex., Dept. No. 103). On March 17, 1971, FHWA advised LDH that the EIS should include the entire I–220 project, rather than just the west portion affecting the lake and suggested how the statement could be improved (Ex. P–17, p. 115). On June 11, 1971, LDH submitted a new draft EIS and 4(f) determination (Supp.App. 21–34). This statement was circulated for comments pursuant to Section 102(2)(C) of NEPA, to some 34 federal, state, local and private agencies and organizations,

including the appellant Louisiana Environmental Society (Ex., Dept. No. 131 (final EIS), pp. 71, 72).

On November 18, 1971, the LDH submitted a final EIS/4(f) statement (App. 763). The Regional FHWA office returned it for further consideration of alternate locations and a firmer basis for the 4(f) finding (App. 763). On April 27, 1972, LDH submitted a revised statement which was again returned for additional information (App. 763). It was revised and again submitted on October 17, 1972 (App. 762), and approved and adopted by the Regional FHWA office on October 24, 1972.

However, upon its submission by FHWA to DOT, the Assistant Secretary for Environment Safety and Consumer Affairs, Benjamin O. Davis, Jr., reviewed the statement and found specific defects which he outlined in a memorandum of February 22, 1973 (App. 766–772). It was thus returned to LDH for specific improvements regarding (a) comments received, (b) the analysis of alternatives and (c) measures to minimize harm (Ex., Dept. No. 119). In response, a supplement to the final EIS/4(f) statement, responsive to the issues identified, was prepared by LDH and approved and adopted by FHWA (Ex., Dept. No. 131). It was personally approved by Secretary Brinegar on June 4, 1975 (App. 59–63); Ex., Dept. No. 121). When he made this determination, in addition to the revised and supplemental final EIS/4(f) statement, his staff's analysis and other materials, Secretary Brinegar also had before him a lengthy letter of May 9, 1973, from Mr. Billy R. Pesnell, on behalf of the Louisiana Environmental Society, commenting in detail on the supplement to the statement. (App. 785–804). The Secretary also had before him an analysis of Mr. Pesnell's comments (App. 805–809). And staff members of the Assistant Secretary for Environment, Safety and Consumer Affairs met with Mr. Pesnell and reviewed his concerns before the Secretary acted (App. 783).

The Secretary's approval specified that, prior to FHWA approval of Plans, Specifications and Estimates (hereinafter PS&E) (App. 62), the Louisiana State Health Department must review and approve the final design and operating plans for the drainage system in the bridge over Cross Lake (App. 783, 784; Ex., Dept. No. 121). On June 6, 1973, it was transmitted to the Council on Environmental Quality for filing pursuant to NEPA (Ex. P–16, p. 59).

### "THE DESTRUCTION OF PARKLAND"

██ *Overton Park* standards are applicable where there is a "destruction of parkland," which is to be equated with a substantial use or taking of recreation areas. In determining whether there are "truly unusual factors" we must determine the nature and substantiality of the taking. Overton Park in Memphis, Tennessee is a 342-acre municipally owned area in midtown Memphis. It is used for a zoo, a nine-hole golf course, an outdoor theatre, an art academy, picnicking and has 170 acres of forest. The proposed interstate through the park was to consist of six lanes, three running in each direction, separated by a median strip approximately 40 feet wide. It severed the zoo from the rest of the park. The right-of-way varied from 250 feet to 450 feet in width. It required the destruction of 26 acres of the park. A 1200-foot access ramp was to be located within the east end of the park. In *Overton Park* there was, in truth, a substantial "destruction of parkland," a substantial taking of a recreation area.

Cross Lake is not a "land" park. It is an artificial lake. The "taking involved is *18 acres of air space over a 9,000-acre lake.* Less than one acre of the lake bottom will be occupied by pier fittings. To provide for full recreational use, at a substantial additional construction cost, the design of the bridge was revised to provide a minimum 38-foot vertical clearance for approximately 7,090 feet, 83% of the crossing. The revised design included 100-foot spans in order to afford wide openings to accommodate the movement of recreational water vehicles

back and forth under the bridge. There will be 1,000 acres of the lake east of the bridge and 8,000 acres west of it. The administrative report reveals explicitly the numerous and sundry measures which have been taken to eliminate or satisfactorily minimize to the extent that neither the human environment nor the ecology of the area will be significantly altered or harmed. We find no reason to quarrel with the Secretary's conclusion that the I–220 route will actually benefit the recreational usage of Cross Lake.[8] (4(f) statement, Vol. 1, pg. 43).

Then, too, the present alignment was approved in 1965. Surely, irreversible and irretrievably commitments have been made by public bodies as a result of this 1965 approval. One should not indefinitely delay the construction of a project. It is true that Congress has increasingly expressed concern for the protection of the national environment, but it is also true that Congress has articulated a strong national policy to complete construction of interstate highways. If this case were remanded to the Secretary, he could, of course, abandon the project and give no further reasons, but if some other route was submitted and approved we would start all over again with local hearings, economic impact hearings, environmental impact hearings, and Title VI civil rights hearings. It was estimated that this would take a period of at least 10 years. This factor I consider to be unique within the meaning of *Overton Park*.

### ALTERNATIVES

■ Endless study of various similar alternatives is simply not required. *Sierra Club v. Morton*, 510 F.2d 813, 825 (5th Cir., 1975). The agency need only consider and examine reasonable alternatives, not every conceivable alternative. Somewhere there must be an end to the process, or no federal-aid highway would

ever be built. There will always be unexplored and undiscussed alternatives. The Louisiana Highway Department held hearings on this project in December of 1964. Federal approval was granted this alignment in February of 1965.

The EIS "need only set forth those alternatives 'sufficient to permit a reasoned choice.'" *Life of the Land v. Brinegar* (9th Cir., 1973), 485 F.2d 460, 472 quoting *National Resources Defense Council, Inc. v. Morton* (1972), 148 U.S. App.D.C. 5, 458 F.2d 827, 836. When the alternatives are thus set forth, an EIS does not become vulnerable because it fails to consider in detail each and every conceivable variation of the alternatives stated. *Brooks v. Coleman*, 518 F.2d 17 (1975), p. 19.

The Secretary considered several alternatives, as follows:

(1) The proposed alignment or adopted alignment. (Blue—Exh. Dept. 205)

(2) Alternate Route "A" which crossed the lake much farther to the west. (Exh. Dept. 131, Exh. 12)

(3) Alternate Routes "B" and "B–1" which cross the lake at Willow Point peninsula just west of the approved route. (Exh. Dept. 131, EIS Exh. 12).

(4) Alternate Route "C" which skirts the lake to the southeast, crossing two fingers of the lake. (Ex. Dept. 205, red)

(5) Alternative Route "D" which completely misses the lake and skirts the lake to the northwest. (Ex. Dept. 131, EIS Exh. 12)

(6) The "partial completion" alternative wherein I–220 would terminate on the proposed alignment at Blanchard Road.

The Secretary's 4(f) determination was that all of the alternate routes studied

---

**8.** There are currently four sail boat racing courses on the lake. One will have to be relocated and minor adjustments made to another. The overwhelming majority of the boats which use Cross Lake are fishing boats, and no prob-

lem exists for them. The conclusion was reached, and once again we have no reason to second guess the Secretary, that fishing will be improved.

were "feasible," but only the adopted alignment was "prudent."

Additionally, the Secretary considered the "no-build" alternative. These include both alternatives that do not cross the lake and various alternative routes over the lake. These routes are clearly described and are illustrated by the maps attached to the EIS/4(f) statement as Figure 1 and Exhibit 12 (Ex., Dept. 131, EIS/4(f), pp. 12–32, Figure 1, Supp. EIS/4(f), 6–13).

Plaintiff insists that Secretary Brinegar should have found alternate route C (across the extreme east end of the lake) to be a prudent alternative, and that it was rejected *solely* on the grounds of significant displacements of people and businesses and obstructions to the view of the lake from a number of homes. The Fifth Circuit decision mentions this route and a modified one. We considered the appellate language as an invitation to further development of these possibilities.

Defendants did not abandon Alternate C to save costs. The basic premise of *Overton Park* that "there will always be a smaller outlay required from the public purse when parkland is used" (401 U.S. at page 412, 91 S.Ct. at page 821) is not applicable. LDH has not spared costs; bridge construction is quite expensive. For example, the Cross Lake Bridge as originally conceived would have cost about $7,000,000.00; the latest estimate is $26.6 million. Incorporation of the enclosed drainage system cost close to $1,000,000.00 and severely limits the type of bridge structure which can be built.[9]

 The fact that additional considerations mitigating against the selection of route "C," variations thereof, or other alternates were brought to light after the Secretary of Transportation gave 4(f) approval of the selected alignment is inconsequential. See *Brooks v. Coleman*, supra, at p. 19, where the court rejected appellant's argument that sufficient consideration had not been given to a pro-posed alternate to the use of parkland because this option had been examined in depth only after the final EIS had been completed and the current plan approved by the Secretary of Transportation. It was with this in mind that parties were permitted to present evidence at the January hearing in this court.

Under FHWA Guidelines issued in 1973 to implement Title VI of the Civil Rights Act, minority groups which might be adversely affected by the location of a Federal-aid Highway project must be consulted and such possible adverse effects carefully evaluated before location approval can be given. (49 CFR Part 21) (Ex. Dept. 220, 221). These guidelines are not applicable to the present alignment as approval was given to both its locations and design prior to 1969. However, it is clear that such guidelines *would* apply to alignment C and C Modified, should the State Highway Department seriously consider adopting one of them. Note the testimony of Gene Kluckley. (Title VI Guidelines, marked Dept. Exh. 220 and 221.) Basically, these guidelines also require that the government make prudent inquiry into whether a highway constructed with federal aid creates a barrier between white and black neighborhoods. An examination of the exhibits reveals that white subdivisions (Lake Forest Hills, Southeast Shore Cross Lake) are on the west side of both Modified "C" and the original "C." These are exclusive white subdivisions. On the east side are evolving minority neighborhoods. This alone might well prevent the Secretary from finding either Modified "C" or original "C" to be "prudent." However, it should be quickly added that this information was not before the Secretary and was developed only during the January hearing.

It is apparent from the testimony of Charles Planchard and James Doyle that both "C" alignments would have impacts upon minority communities that are relatively unaffected by the present align-

---

9. Ecology *is not at war with economics, but for the record see attachments (Dpt. No. 216*

and plaintiffs' "A"); Route C(106.92M) adopted blue (85.49M).

ment. Indeed, there was testimony that original alignment "C" would split and virtually destroy the finest minority subdivision in the City of Shreveport. Whether, upon investigation, these impacts would be of such a nature and magnitude as to be unacceptable under Title VI, is unclear. Also unclear is the weight which such impacts would be given by the Supreme Court within the context of *Overton Park.*

Suffice it to say, the record points to serious potential obstacles of an extraordinary magnitude to the adoption of either "C" or "C" Modified, in addition to those obstacles of substantial delay, costs, displacements, general community disruptions, and proximity to the water intake.[10] Both also cross a minor segment of the lake near the Water Intake and Purification Plant. *Finish Allatoona's Interstate Right, Inc. v. Brinegar,* 484 F.2d 638 (5th Cir. 1973).

On the question of displacement, I would think that the Secretary could have easily held that the displacements on "C", both modified and original, were "truly unusual" and of extraordinary magnitude under the total circumstances. Modified "C" would require the displacement of (see Exhibit 216):

```
120 single family dwellings
100 single apartment units (1 apt. project)
900 persons
 7 businesses
 1 church
 1 lodge
```

Original "C" would require the displacement of:

```
 377 single families
1508 persons
 21 businesses
 2 churches
```

The adopted alignment is furthermore the only alignment which truly satisfies the purpose of the I–220 By-pass and conforms with the Shreveport-Bossier Metropolitan Plan and Transportation Study. Alternate alignment "A" as described in the EIS would be too remote to the Metropolitan area to provide the necessary traffic service required, both presently and in the future. Alternate "B" was found to be compatible with existing and proposed developments and present and future transportation needs of the Metropolitan area; however, the western terminus of this alignment with I–20, being immediately north of the airport, would not be compatible with the development of a connected circumferential freeway south of I–20. Alternate "B–1" was determined to be feasible but not prudent for the same reasons as were set forth for Alternate "B" in addition to unnecessary and objectional indirection caused by design and operational problems regarding the proposed Blanchard Road Interchange.

Construction of I–220 along Line "C" was also determined to be feasible but not prudent based upon similar engineering objections advanced for alternates "B" and "B–1." As noted earlier, various economic, social, and environmental factors also mitigated against the selection of route "C." Alternate "D" involved an alignment west of Cross Lake and of Line "A" avoiding completely the Cross Lake area. This alignment was rejected due to the long circumferential routing and indirection of Line "D" causing through traffic to continue on I–20, adding to the increasing traffic congestion of the Shreveport-Bossier City urban areas. This alignment was also found not to meet the traffic needs of the developed areas, either currently or in the future, of the Shreveport-Bossier City Metropolitan area as defined in the Shreveport Plan and Transportation Study dated 1968 by Howard, Needles, Tammen and Bergendoff, Consulting Engineers. The selection of this alternative would also place I–220 outside the developed area extremely limiting its potential use as a by-pass.

---

10. The adoption of either "C" or "C" Modified would result in a ten year delay (testimony at trial on merits).

## ALL POSSIBLE PLANNING TO MINIMIZE HARM HAS BEEN DONE

The Supreme Court in *Overton Park* did not define or construe these words, but in *Overton Park* on remand the construction "all *reasonably* possible planning" was implemented. 2 ELR 20065.

LES first attacks this on the basis of the Secretary's 4(f) determination that prior to PS&E approval, the Louisiana State Health Department must review and approve the final design and operating plans for the drainage system in the Cross Lake Bridge. (Ex. Dept. 121).

PS&E approval represents the federal approval wherein federal funds are committed to a project in the context of the administrative processes connected with the administration of the Federal-Aid Highway Act. Until PS&E approval is granted the federal government is not obligated to fund a construction project. (23 U.S.C. § 106(a); *Lathan v. Brinegar*, supra).

We agree with defendants that the Secretary's continued concern, action and specific conditions regarding the bridge drainage system are not the "vague generalities or pious and self-serving resolutions" or assumptions that "someone else will take care of it" condemned in *Monroe County Conservation Council v. Volpe*, 472 F.2d 693, 700–701 (2nd Cir., 1972), but rather is in the spirit of cooperative federalism.

Beyond this the LES' attack is three pronged and aimed at (1) the bridge span lengths, (2) the enclosed drainage system, and (3) the guard barrier rail.

### 1. *The Bridge Spans*

The Cross Lake Bridge is technically described in the affidavit of Willis G. Grinstead of HNTB who supervised the design of the Cross Lake Bridge. (Ex. Dept. 207) The original bridge concept had 84-foot spans and 20-foot vertical clearance. The original concept was then raised to satisfy the Shreveport Yacht Club which requested one 100-foot span with 38-foot vertical clearance in the bridge crossing. (Ex. Dept. 200) As a concession to the Yacht Club the entire bridge was redesigned to contain 100-foot spans and 38′ vertical clearance above highwater level. This type of construction also lends to the aesthetic appeal of the structure. Vertical clearance has been designed to a minimum of 34.5′ above lake high water, occurring at the north shore of the lake. From that point, the clearance increases to a clearance of approximately 55′ at the south shore of the lake. This provides a 38-foot minimum vertical clearance for 83% of the lake crossing above high water. Defendant's evidence further shows that only approximately 18 acres of air space over Cross Lake will be occupied by the bridge and only approximately one acre of the lake bottom will be occupied by the pier footings. The pier stems are estimated to occupy 0.14 acres of the lake surface. Additionally, the pier footings were lowered. The elevated nature of the bridge is also expected to reduce noise pollution in the area as opposed to a ground level structure running parallel to the lake around its perimeters. Ex. Dept. 215 summary of sailboat classes further demonstrates that 100-foot spans and 38-foot vertical clearance are more than adequate for the sailboats that use Cross Lake. It is also noted that the average high water is 170 feet, giving 40-foot vertical clearance most of the time.

LES argues for 160-foot spans. A 160-foot span bridge would require steel girder construction which is incompatible with incorporation of a concrete closed drainage system. On balance, the Secretary's wisdom is clear—160-foot spans also have environmental disadvantages.

### 2. *The Enclosed Drainage System*

Richard E. Schwab, a hydrologics engineer of HNTB designed the enclosed drainage system and presented a detailed affidavit setting forth the design standards and specifications. (Ex. Dept. 209) The writer notes Mr. Pesnell asked him only one question under cross-examination. The enclosed drainage system is designed to accommodate a 100-year storm and the storm of record in Shreveport, Louisiana.

### 3. *The Guard Barrier Rail*

Information concerning the guard barrier rail was presented in Willis G. Grinstead's affidavit. (Ex. Dept. 207) Attached thereto is a testing procedure for high center of gravity trucks.

All possible planning has been conducted to minimize harm to Cross Lake. In addition, there is NO destruction of a recreational area. The actual taking of air and pier rights is minimal.

### CONCLUSION

The Secretary acted within the scope of his authority and his action was justified under applicable standards. He "could have reasonably believed that in this case" (*Overton Park*, 401 U.S. at 416, 91 S.Ct. 402) there were "unusual factors present" (401 U.S. at 413, 91 S.Ct. 402) and/or that the alternatives did involve problems of an extraordinary magnitude. This is apparent both from the administrative record and the evidence adduced during the hearing in this court earlier this month.

Judgment should be entered for defendants. So ordered.