LOUISIANA ENVIRONMENTAL
SOCIETY, INC. and Mrs.
Vernon B. Chance, Sr.

v.

Claude S. BRINEGAR; Secretary, U. S. Department of Transportation; and Department of Highways, State of Louisiana.

Civ. A. No. 17,233.

United States District Court,
W. D. Louisiana,
Shreveport Division.

April 9, 1981.

Billy R. Pesnell, Shreveport, La., J. Arthur Smith, III, and W. Jeffrey Hollingsworth, Baton Rouge, La., for plaintiffs.

Charles C. Grubb, Shreveport, La., for amicus curiae.

Sharon F. Lyles and James B. Fredrick, Jr., Baton Rouge, La., J. Ransdell Keene, U. S. Atty., Leven H. Harris, Asst. U. S. Atty., Shreveport, La., Jean Rogers and John K. Kraybill, Regional Counsel, Fort Worth, Tex., for defendants.

## OPINION

NAUMAN S. SCOTT, Chief Judge.

### THE CASE

Almost ten years ago, in October of 1971, a temporary restraining order was granted enjoining the defendant, Louisiana State Highway Department (now the Louisiana Department of Transportation and Development), from continuing with Federal-Aid Highway Project No. I–220–1(50)14 Shreveport By-Pass.[1] In January of 1974 this case was heard on a motion by the plaintiffs for a preliminary injunction against the defendants (including the Federal defendant, the Secretary, United States Department of Transportation). We denied plaintiffs' motion for preliminary injunction and the United States Court of Appeals for the Fifth Circuit affirmed that denial;

"... we conclude that the significance of the first issue to the future history of this litigation warrants discussion now. Under section 4(f) the Secretary of Transportation is required *not* to approve a highway project which uses a recreational area *unless* (1) there is no 'feasible and prudent alternative,' and then only if (2) the project 'includes all possible planning to minimize harm.'" 524 F.2d 930 at 932.

1. We note other designations for this project: (a) State Project No. 700–02–82 (Engineering) FAP No. I–220–1(37)13 Shreveport By-pass (Government Exhibit 301 and others)

(b) State Project No. 700–02–82 FAP Nos. I–220–1(3)13 and I–220–1(37)13 (Government Exhibit 306 and others).

The Court of Appeals then outlined the Secretary's duties pursuant to § 4(f).[2] In January of 1976 this case was heard on the merits for permanent injunctive relief against the building of the I–220 bridge over Cross Lake on the route adopted by the defendants. We denied plaintiffs' request for a permanent injunction against the project and the United States Court of Appeals for the Fifth Circuit at 537 F.2d 79 (1976) affirmed this Court on all issues except for the holding that the defendants' § 4(f) determination was valid. The Court of Appeals also questioned our holding that additional public hearings were not required under 23 U.S.C. § 128(a) and Federal Highway Administration Policy and Procedure Memorandum (PPM) 20–8. The Court of Appeals directed also that a preliminary injunction restraining proceedings to construct the bridge across Cross Lake be entered until the Secretary complied with § 4(f) and until an additional public hearing was either held or sufficient facts were found to justify the denial of any new hearing. In May of 1977 we ordered that a new public hearing be had in accord with 23 U.S.C. § 128(a) and PPM 20–8 because findings of the necessary facts, to justify a finding that no further hearings were necessary, would have resulted in a longer delay in the completion of this project than would the holding of such hearings. Defendants held a combined location and design public hearing on the project in November of 1977. The plaintiffs have not challenged the adequacy of the public hearing and we need not address that issue.

On December 5, 1978, Karl S. Bowers, Federal Highway Administrator, issued a § 4(f) determination. (Government Exhibit 308). The Administrator's determination reaffirmed the Adopted Line bridging of Cross Lake as that route which minimized harm to the Cross Lake recreational area. The reaffirmation, submitted by the defendants, was accompanied by a Motion for an Order to Show Cause why judgment should not be entered declaring the defendants had fully complied with the requirements set forth by the United States Court of Appeals for the Fifth Circuit and by the District Court in its Order dated May 17, 1977. Defendants used this vehicle rather than filing a motion to dissolve the injunction because, inadvertently, an injunction had never been issued as directed by the Fifth Circuit.

On March 21, 1979, the plaintiffs filed their Third Supplemental and Amended Complaint in this action, challenging and attacking the validity of the § 4(f) determination made by the Administrator. We remanded the § 4(f) determination to the Administrator on January 10, 1980 (effective December 18, 1979) for clarification. We were unclear as to the nature of the "attachments" to the Administrator's December 5, 1978 reaffirmation. (Government's Exhibit 306 & 307). Defendants submitted an affidavit dated January 24, 1980 by the Administrator, Karl S. Bowers, which affidavit sought to explain the "attachments" as documents relied upon by the Administrator in making his § 4(f) determination.

We informed the parties that we would consider this case pursuant to the mandate of the United States Court of Appeals for

---

**2.** 49 U.S.C. § 1653(f). It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sights. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

See 23 U.S.C. § 138.

the Fifth Circuit in its Opinion at 537 F.2d 79 (1976). Since, as we have stated, the public hearing issue, the adequacy or propriety thereof, has not been challenged by the plaintiffs, there is no need for this Court to address that issue. What is left for this Court to decide is whether or not the Administrator's § 4(f) determination is valid.

## A BIRD'S–EYE VIEW

Cross Lake has a surface area of nearly 9,000 acres, with an average depth of 8 to 9 feet. The lake, man-made by constructing a concrete dam that impounded a channel of Cross Bayou, serves as the water supply for the City of Shreveport and Barksdale Air Force Base. The full range of recreational activities associated with a body of water this size, considering its proximity to the entire metropolitan Shreveport area takes place year-round or in season depending upon the activity. Boating, sailing, skiing, fishing, hunting, as well as hiking, picnicking, and nature appreciation, are all part of the activities associated with this recreational area. Eight alternatives have been discussed and considered during the pendency of the planning and litigation process concerning this highway and the bridging of Cross Lake. The Fifth Circuit found that only Route D and the No Build decision were "alternatives to the use of the" recreational area. The other routes, A, B, B–1, C, and C-Modified, as well as the adopted route, all "use" the Lake. The Appeals Court agreed with the Secretary that both Alternate D and the No Build alternative were imprudent because they failed to fulfill the needed purpose of a circumferential highway route. Alternate D sweeps too far to the west and No Build means no by-pass.

"But, this is only the first half of the § 4(f) inquiry.[3] Section 4(f)(2) requires that all possible planning to minimize

harm to the parkland must be accomplished before the Secretary can approve the parkland route. The relocation of a highway through another portion of a recreational area must be considered as a means of minimizing harm to the area. (citations omitted). This requires a simple balancing process which would total the harm to the recreational area of each alternate route and select the route which does the least total harm. 537 F.2d 79 at p. 85 (1976)."

The Appeals Court also found route A imprudent, thus reducing the available alternatives to routes B, B–1, C, C-Modified and the Adopted Line. In his December 5, 1978 reaffirmation, the Administrator sought to undertake this "simple balancing process" and determined that the Adopted Line was the route that "minimized harm" to the recreational resource, the lake. At the trial of this matter we were presented with expert testimony on the impact of the Adopted Line as compared with C-Modified. We conclude therefore that plaintiffs concede that the Adopted Line is less harmful than routes B, B–1 and C. Having thoroughly considered the Administrator's § 4(f) determination of December 5, 1978 and his January 24, 1980 affidavit, as well as the testimony at trial, including the exhibits submitted by the parties, it is our opinion that the impacts on the recreational activities on and around the Lake are nearly equivalent.

*"Active" Recreation*:

It is true that the Adopted Line bisects the Lake in an area widely used for power boating, skiing, fishing and sailing. The bridge itself has been designed with these activities in mind. There would be nearly 95 feet of clear space between the piers supporting the structure. This is enough area for power boats and skiers to safely pass under the bridge, albeit at speeds and

---

3. "Section 4(f)(1) requires that each 'alternative *to the use*' of the parkland must be found to be either infeasible or imprudent before the Secretary can approve the use of parkland. The Secretary rejected alternates A, B, B–1, C and C-Modified and the no-build alternative

because they were feasible but not prudent; however, only alternate route D and the no-build decision were 'alternatives to the use of the' recreational area." 537 F.2d 79 at p. 85 (1976).

direction regulated by the Cross Lake Patrol. But skiing is restricted at present to certain ski areas and there is sufficient area on either side of the Adopted Line for those ski areas the Patrol delineates every year. The C-Modified route has no practical impact on power boating and water skiing. This is simply because power boating, except for those few boats that are leaving or returning to the Villa Del Lago Apartments Marina and water skiing are not allowed in the City Pocket area that the C-Modified bridge would traverse. Neither route impacts fishing except during the period of construction. Principal fishing areas are located in the western end of the lake. Sailing would be adversely impacted by a bridge on the Adopted Line more so than one on the C-Modified route. We consider this a slight impact because Cross Lake is a considerable body of water, and there is sufficient clearance for sailboats to traverse the Adopted Line. The bridge on the adopted line has been designed to allow for at least a 38 foot clearance. This change from the original design was prompted by consultations with the Shreveport Yacht Club. Traditionally sailing courses are set each race day according to wind direction and there is ample room on each side of the Adopted Line for such courses. However, the courses for long distance races, which occur two or three times a year, would suffer greater modification. Sailing is not affected by C-Modified. We find that the impact of the Adopted Line on active recreation on the lake is so minimal that the Administrator's determination could be approved even though the impact by C-Modified is less.

*"Passive" Recreation:*

One of the greatest attributes of Cross Lake is the aesthetic value it has for anyone living on the lakeshore as well as those hiking, picnicking, fishing, or viewing the lake. There can be no doubt that a bridge structure consistent with those planned on either route will significantly intrude into the visual experience of anyone looking at the lake in that area. We find this visual impact to be the most substantial impact to the recreational area of Cross Lake. Accordingly, that testimony and those exhibits produced by the parties in relation to this aspect of harm done to Cross Lake must be considered. But our consideration is also affected by our personal and detailed visual inspection (with the parties) of C-Modified and the Adopted Line and a visual inspection of that portion of the lake and lakeshore affected.

Plaintiffs' expert witness, Smardon, testified about his theory of the visual impacts of both routes. Plaintiffs' Exhibits 332 and 333 were prepared by the witness to illustrate that theory. Examination of plaintiffs' Exhibit 333, which purports to show the visual impacts of the bridge on the Adopted Line, is self-impeaching. Willow Point is very high heavily wooded ground which juts into the lake and effectively blocks any view of the Adopted Line bridge from the west shore to a point where the impact is insignificant. (Our visual inspection and Plaintiffs' Exhibit 318). A similar analysis renders plaintiffs' Exhibit 332, the view shed map of the C-Modified route, no more reliable than plaintiffs' Exhibit 333. While we do not doubt that individuals actually on the water surface in a boat or on skis will see either route, depending upon the area on which the viewer is stationed, we do not think that everyone on the lake will be looking in the direction of whichever bridge is constructed. Nor do we adopt the implication in plaintiffs' presentation that every impact made by the bridge on the Adopted Line is necessarily adverse. Or that it is adverse no matter how slight or distant. Everything on or about the lake makes a visual impact, even the lake itself, the boats, the piers, the houses. Thus the bridge does not create an adverse impact, simply because it is a bridge. The government very substantially reduced harm by the design of the bridge. It is not a structure of heavy pilings and massive or towering super-structure. It is of simple uniform design that blends well into the surface of the lake. It really does not cut off the view of the lake for anyone except the lake-side residents on the East side of Willow Point, much in the same way that C-Modified cuts

off the view of the lake from City Pocket. We find that the only significant visual impact by the Adopted Line extends from the point of Willow Point east to the American Legion Home. From other points the impact will be no worse than the impact by the railroad or the dam on the north shore. Although we find only slight visual impact (except in Gar Pocket), we must concede that the lake would be better off without it.

An examination of plaintiffs' Exhibits 323 and 324[4] reveal that the defendants subscribe to the extreme opposite position. That is, the visual impact of the adopted route is less than one-half of the impact of the C-Modified alternative.

"The length of shoreline along which the highway would form a dominant focus is much greater with the C/C-Modified corridor alternative, negatively impacting 16,750 feet and 14,000 feet, respectively, as compared with the Adopted Line's impact on 6,200 feet of shoreline. Even with the highway as low as is consistent with other conditions, the view of the lake and activities on the lake by residents east of the highway will seriously be infringed upon. The same visual intrusion will impact persons walking or otherwise enjoying the recreational opportunities along the shoreline east of the C/C-Modified corridor alternative. Since these visual intrusion impacts are lessened by moving away from the position of the viewer, the Adopted Line with a distance of approximately 1 mile minimizes the visual impact for residents and shoreline visitors along the east end of the lake. A smaller number of residents on Willow Point and a shorter length of shoreline are visually impacted by the Adopted Line.

"The visual impact is the dominant difference between the Adopted Line and the C/C-1 corridor alternative. As the location which intrudes the least into visual experiences of the public and provides increased visual qualities to the greatest

number of people, the Adopted Line can be accepted as the route which minimizes harm." Section 4(f) Analysis of the Administrator, December 5, 1978, P. 4 (Government Exhibit 308).

Exactly how the Administrator arrived at this conclusion is of some concern to us as we will point out.

*Other Impacts:*

We heard testimony from both plaintiffs and defendants concerning impacts of noise, water, and air pollution. These problems will exist regardless of where the highway and bridge are built. The adverse impacts caused by these sources of pollution are equivalent. Recreators on the lake would perceive more noise from a bridge on the Adopted Line than would a resident of Lake Forest Hills Subdivision. The C-Modified route would have more of an immediate adverse impact on that subdivision than would the Adopted Line. Regardless of where the bridging of Cross Lake takes place, the water, air, and tranquil quality of that immediate area will suffer more than an area where there is no bridge. As with active and passive recreation, the magnitude of the harm depends upon where the individual is in relation to where the highway and bridge are. The lake itself, the recreational area, will not be degraded any more or any less by the Adopted Line or C-Modified. If the residents living in the area around the lake are included in the term "recreators", as we find they must, then there is no doubt that C-Modified will cause much more harm to the lake area. It takes people to hear, to smell, to breathe. The only recreators living at the south end of the Adopted Line, reside at the lake side and none reside at the north end. Plaintiffs' Exhibits 306, 313, 314, 317. C-Modified subjects many more such recreators to these impacts on a 24 hour basis, Same Exhibits.

4. Although these exhibits were prepared by defendants' consultant Price of Howard, Needles, Tammen & Bergendoff, Consulting Engineers, they were introduced and filed in evidence by the plaintiffs during the testimony of Price whom the plaintiffs called on cross-examination.

## SCOPE OF REVIEW

However, we do not decide this case on a *de novo* basis. The United States Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), held that a § 4(f) determination made by the Secretary of Transportation is subject to judicial review under the provisions of the Administrative Procedure Act, 5 U.S.C. § 706.[5] The Court acknowledged that the Secretary's determination was entitled to a presumption of regularity. That presumption, "is not to shield his action from a thorough, probing, in-depth review." *Overton Park, supra*, at p. 415, 91 S.Ct. at p. 823.

"Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1964 ed., Supp V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error or judgment (citations omitted). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Overton Park, supra*, at p. 416 [91 S.Ct. at p. 823]."

■ Basically, we are required to review the evidence the Administrator con-

sidered or should have considered if any and then determine whether the Administrator's determination is reasonable. In that we are only concerned with that portion of the Administrator's determination under § 4(f)(2), the question is, did the Administrator use "a simple balancing process which would total the harm to the recreational area of each alternate route and select the route which does the least total harm?" As *Overton Park* prescribes, we cannot substitute our judgment and choose the route that we believe does the least total harm to the recreational area, but rather, we are empowered to either affirm the Administrator's decision based upon the "Administrative Record" or if that decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, we must overrule the Administrator and remand this action to him. The burden is on the Administrator, and he may not prevail simply because evidence in this record will not support certain of the objections of plaintiffs.

## OUR REVIEW

■ In its opinion remanding this case to this Court, the Court of Appeals for the Fifth Circuit detailed the principles which should have governed the process the Administrator should have undertaken.

"The significant difference between the § 4(f) subsection (1) and (2) assays is that considerations which might make an alternate imprudent (such as displacement of persons and businesses or a Title VI

---

**5.** 5 U.S.C. § 706. Scope of Review.

To the extent necessary to decision and when presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
B) contrary to constitutional right, power, privilege, or immunity;

C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
D) without observance of procedure required by law;
E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

problem) are simply not relevant to determining whether a different path would minimize harm to the recreational value of Cross Lake." 537 F.2d 79 at p. 86 (1976).

The Court of Appeals affirmed the rejection of Alternate A and Alternate D as they sweep too far to the west to serve the purposes of an urban circumferential highway. The Court of Appeals went further:

"Alternate C and C-modified however, must be carefully considered. They harm the lake in that they cut off its view by residents and visitors on the eastern side of the lake while the adopted route creates minimal visual distraction. Although C and C-modified do not interfere with sailing or skiing as does the adopted route, they are closer to the Shreveport water intake valve. We do not reach whether the Secretary could have reasonably concluded that C, C-modified, or even A, B or B–1 did less harm to Cross Lake than the adopted route *because the Secretary did not perform the balancing of relevant considerations which we hold § 4(f)(2) requires.* (emphasis supplied)." 537 F.2d 79, at p. 87 (1976).

After a careful consideration of the "Administrative Record" we are convinced that the Administrator failed to follow the mandate of the Court of Appeals. There are at least two glaring examples of this failure. The Administrator's conclusion that the adopted line is "the location which intrudes the least into visual experiences of the public and provides increased visual qualities to the greatest number of people ..."[6] is unsubstantiated by the evidence in the Administrative Record. Further, in his affidavit of January 24, 1980, the Administrator stated:

"In making my December 5 Reaffirmation, I did consider the adverse impact that construction of Alternate C or C-Modified would have on the water supply of Shreveport. The impact of the project on the water supply and water treatment facilities along with the proximity of the

alternate routes to the water intake valves were significant factors in my overall determination in selecting the Adopted Line. It was my understanding at the time that my Reaffirmation of the section 4(f) Determination was to be limited to an analysis of the relative harms on the recreational areas of Cross Lake. My Reaffirmation could have gone further to indicate that even if C or C-Modified were determined to be less harmful to the recreational areas, I would have found them to be imprudent alternatives due to the impacts on the water supply of Shreveport and Barksdale Air Force Base."

Not only is this conclusion not supported by evidence in the Administrative Record but in fact is a repudiation of the § 4(f) statement previously approved in this very case.

Defendants in their proposed findings of fact, No. 155, attempt to rehabilitate the Administrator's finding of linear feet of shoreline adversely affected by the various proposed alignments.

"155. The court notes that, apparently through staff oversight, the December 5, 1978, memorandum signed by Karl Bowers failed to reflect that the factor of limitation of access as well as visual impacts was used in calculating the linear feet of shoreline adversely affected by the various proposed alignments. Since the basis for the calculation is clear from the attachments to the memorandum and from the Public Hearing Report, the court considers this to be a matter of form rather than substance. (D.Ex. 303A, X–25; Ex. 306, 4; Ex. 307, 2; Ex. 308)."

We have reviewed those portions of the Administrative Record cited to us by the defendants in their finding of fact, No. 155. Nowhere is it made clear to us that "limitation of access" was a factor in the Administrator's calculation of the linear feet of shoreline adversely affected. It is clear to us that those residents on the eastern shore

---

6. Section 4(f) Analysis of the Administrator, December 5, 1978 (Government Exhibit 308), p. 5.

in Lake Forest Hill Subdivision and the area just south of the subdivision are adversely affected as demonstrated in plaintiffs' Exhibit 323. Since there is no way that these residents and their visitors could actually see the C-Modified route, there must be another reason they are portrayed as being adversely affected. What that other reason is (be it limitation of access or something else) cannot be ascertained from the Administrative Record. More is needed than the assertion:

> "However, all of the alternate lines will impact passive recreation to a greater extent than the Adopted Line because of the disruption of views and physical access resulting from their terrestrial alignments." 4(f) Analysis For I-220 Over Cross Lake, August, 1978 (Government Exhibit 306).

This statement is insufficient to support the Administrator's finding of linear feet of shoreline adversely affected if limitation of access was indeed a factor in the calculation. There is no description of how access is limited. There is no attempt to consider any mitigating factors to minimize that limitation of access. In short, the Administrator's conclusion is arbitrary, capricious, and an abuse of discretion.

Although the Administrator concluded in his December 5, 1978 Reaffirmation and affidavit of January 24, 1980 that C-Modified was imprudent due to the adverse impacts that route would have on the water supply of Shreveport and Barksdale Air Force Base, there must still be evidence in the Administrative Record on which this conclusion is based. We find none. As a matter of fact, in the original 4(f) statement on p. 24, we note the conclusion, approved by the Regional Administrator for the Federal Highway Administration:

> "Potential pollution of the lake, for (sic) the two minor crossings of the lake,

would be rendered improbable by the design concepts and construction procedures similar to those discussed elsewhere for the Adopted Alignment." Final Environmental/Section 4(f) Statement (Government Exhibit 301).

Other portions of the Environmental Impact—§ 4(f) statement belie Administrator Bowers' rationalization, "post hoc" or not, that the C-Modified route would be imprudent due to its impact on the water supply of Shreveport and Barksdale Air Force Base.[7] The EIS/§ 4(f) statement (Government Exhibit 301) refers to planning that will preclude only the utter most remote possibility of contamination of Cross Lake. This statement on p. 15 concludes,

> "In regard to potential water pollution or contamination of Cross Lake, the planning of the Cross Lake Bridge has been developed such that the eventuality of the pollution of this water reservoir has been rendered sufficiently remote as to not really constitute a hazard."

Not only is there this evidence refuting the Administrator's conclusion in the January 24, 1980 affidavit, but we find no evidence substantiating the Administrator's finding. The only mention of the water supply impact in the Administrator's December 5, 1978 Reaffirmation is the reference to the C/C-Modified corridor being close to the water supply intake. The Administrator here[8] had a chance to address what the defendants refer to in their proposed findings of fact and conclusions of law as "of utmost importance". (Defendants' Finding of Fact No. 35). While the defendants have pointed to exhibits, even specific pages, that supposedly support the conclusion that C-Modified is an imprudent route due to its potential impacts on the water supply; we have examined these portions of the Administrative Record and cannot agree with defendants' conclusion that,

---

7. See pp. 15, 24 and 44, Final Environmental/Section 4(f) Statement; Government Exhibit 301.

8. "The C/C-Modified corridor alternative is over shallow pockets of the lake and close to the water supply intake. These conditions discourage (and in the case of the intake there is a

prohibition of) the use of the area for boating, water-skiing, and sailing. The C/C-Modified corridor alternate, therefore, does not directly impact boating, water-skiing, or sailing activities on the lake." Section 4(f) Analysis of the Administrator, December 5, 1978 (Government Exhibit 308, p. 3).

"While the risk of the harmful chemical spill may be statistically slight, the possible consequences in the event it did occur are so grave as to be sufficient, alone, to support a conclusion that Alternate C-Modified is imprudent." (Defendants' proposed Findings of Fact, No. 179).

The defendants themselves point out that there have been several derailments of Kansas City Southern Railroad trains near Cross Lake. In one such accident, railroad cars transporting hazardous materials rolled into the lake. This is in the same exact area near the three water intakes as is the C-Modified bridge. We cannot understand how the Administrator could find that the chances of polluting the lake are negligible due to the design of the bridge on the Adopted Line and yet find the bridge on the C-Modified route to be imprudent when we have no reason to believe that the design of that structure would be any different than the bridge on the Adopted Line. The proximity to the water intakes, considering the defendants' EIS/§ 4(f) statement, the prior train derailments, and the mitigating factor of moving the intakes farther out into the lake as a measure to minimize harm is not enough for the Administrator to have relied on for his conclusion of imprudence. There is no merit to the Administrator's finding that the C-Modified alignment is imprudent under § 4(f) due to "the impacts on the water supply of Shreveport and Barksdale Air Force Base." Whether C-Modified is imprudent is not even the correct standard.

The Court of Appeals did state:

"Although there is no express feasible and prudent exception to subsection (2) (of § 4(f)), the act clearly implies that one is present. Since the statute allows rejection of a route which completely by-passes the recreational area if it is infeasible or imprudent, it is totally reasonable to assume that Congress intended that a route which used the recreational area but had a less adverse impact could be rejected for the same reason. What we stress is that the reasoning process must be kept entirely separate. A route may be rejected because it does not minimize harm only for reasons relevant to the quantum of harm which will be done to the recreational area. If it does minimize harm, a route may be rejected *only for truly unusual factors other than its effect on the recreational area.*" 537 F.2d 79 at p. 86 (1976).

The Administrator's conclusion that C-Modified is imprudent not only does not state any *"truly unusual factors"* to substantiate his conclusion, but the defendants assert in their findings of fact that

"C-Modified is not prudent because it would:

(1) cause residential displacements of 107 units.

(2) create a major division of existing neighborhood, particularly creating a 'barrier' to natural integration of neighborhoods isolating mostly white areas between Cross Lake and the integrated areas farther east, prohibited by Title 49, Part 21, Code of Federal Regulations.

(3) increase potential danger of contamination of the water supply being located only 300 feet from one of the water treatment plant intake lines so that if an accidental spill occurs (a) less reaction time and (b) considerably less dilution of spilled material (dispersion factor).

(4) increased costs.

(5) cause an additional delay of at least 5 years. (Defendants' proposed Findings of Fact, No. 170)."

The Court of Appeals in their remand of this case addressed and either pretermitted or discounted each one of the above findings of the defendants. Defendants state no truly unusual factors and show no displacements or increased costs of extraordinary magnitude to bolster their conclusions. A route that uses the lake, regardless of whether it minimizes harm or not, cannot be found to be imprudent without the Administrator's stating "truly unusual factors" or displacements and costs of "extraordinary magnitude". Instead the defendants assert arguments of imprudence that have previously been discounted.

The Court of Appeals found that, "C and C-Modified require displacements which

cannot be found to be of an extraordinary magnitude." 537 F.2d 79 at p. 87 (1976). At that time, C-Modified would have required displacing 120 single dwellings, 100 single apartment units (1 apartment project), 900 persons, 7 businesses, 1 church and 1 lodge. Now the defendants want this court to find that the displacement of 107 units is of an "extraordinary magnitude". Defendants' position is untenable. The defendants do not state and we find no support for the contention that the increased costs of the project are of an "extraordinary magnitude".

We previously found that a delay of 10 years was "unique within the meaning of *Overton Park.*" 407 F.Supp. 1309 at p. 1322 (1976). The Court of Appeals specifically rejected this conclusion.

> "Most statutory violations expose the offender to sanction. If time is a penalty, it cannot be turned into an exception which justifies non-compliance. Under such reasoning, the exception becomes greater than the statute. We pretermit review of the factual 10 years to comply conclusion, because it cannot be a fact which justifies non-compliance." 537 F.2d 79, at p. 85 (1976).

How can the defendants now assert that an additional delay of at least five years is a "truly unusual factor?" We have already considered the danger of contamination to the water supply and the proximity of the C-Modified route to the water intakes. The Court of Appeals found that the Administrative Record did not mention the problem of splitting black and white neighborhoods. The fact that it is now mentioned by the defendants does not make this Title VI consideration a "truly unusual factor." Defendants point to nothing in the Administrative Record that would substantiate this contention.

### CONCLUSION

We find the impacts to the recreational area and activities of Cross Lake are equivalent. The visual intrusion of either route is the only substantial harm that merits consideration. Both the plaintiffs' and defendants' case are insufficient in this area. Defendants must substantiate their claims, assertions, conclusions and contentions with evidence in or of the Administrative Record. They have not done so.

C-Modified can be found to be imprudent only for truly unusual factors or displacements or costs that reach an extraordinary magnitude. The defendants' conclusion that C-Modified is imprudent is based on old arguments and factors that cannot meet this test. Since we cannot substitute our judgment for that of the Administrator and we cannot uphold his decision as based on the Administrative Record, we have no alternative except to set aside the § 4(f) findings of December 5, 1978 and January 24, 1980 and remand this entire matter to the Secretary of Transportation for further proceedings in accordance with law and not inconsistent with this opinion.