LOUISIANA ENVIRONMENTAL SOCIETY, INC. and Mrs. Vernon B. Chance, Sr., Plaintiffs-Appellees,

v.

Elizabeth Hanford DOLE, Secretary of Transportation, Defendant-Appellant,

Department of Highways, State of Louisiana, Defendant-Appellant.

LOUISIANA ENVIRONMENTAL SOCIETY, INC. and Mrs. Vernon B. Chance, Sr., Plaintiffs-Appellants,

v.

Elizabeth Hanford DOLE, Secretary Department of Transportation, Et Al., Defendants-Appellees.

Nos. 81–3784, 82–3042.

United States Court of Appeals, Fifth Circuit.

May 26, 1983.

Rehearing and Rehearing En Banc Denied July 19, 1983.

Sharon F. Lyles, Baton Rouge, La., Thomas H. Pacheco, Dirk D. Snel, Appellate Section, Land & Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants-appellants.

Billy R. Pesnell, Shreveport, La., J. Arthur Smith, III, Baton Rouge, La., for Louisiana Environmental Soc. and Chance.

* District Judge of the Western District of Louisiana, sitting by designation.

1.  49 U.S.C. § 1653(f) provides:
    (f) It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites. The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed. After August 23, 1968, the Secretary

Before RUBIN and TATE, Circuit Judges, and Davis *, District Judge.

TATE, Circuit Judge:

Two appeals are consolidated for argument and decision: *No. 81–3784,* by the governmental defendants, from a district court judgment that set aside an administrative determination in connection with the proposed construction of a bridge; and *No. 82–3042,* an appeal by the plaintiff environmentalists from the district court's striking of twenty-three allegations from their third supplemental and amended complaint. We will discuss these appeals separately below. For reasons to be set forth more fully, in the former appeal we reverse the ruling of this district court, finding that the administrative record adequately supports the non-arbitrary administrative determination; and in the latter appeal we affirm the district court's ruling, finding no abuse of discretion in denying amendment of the plaintiff's prior complaints under the circumstances here reflected.

### I.  *Appeal No. 81–3784*

In this appeal, the central issue concerns the adequacy of the administrative determination that the route for a bridge across a large recreational lake met the requirements of section 4(f) of the Department of Transportation Act, 49 U.S.C. § 1653(f) (hereinafter "Section 4(f)").[1] In essence, as applied to the present situation, this enactment requires that a highway may not be constructed across public park and recrea-

shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

tional lands unless it is first determined that, of the feasible routes, the route selected is the one that minimizes harm to the recreational value of a parkland. *Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 86–87 (5th Cir.1976) (hereinafter, "*Coleman*").

The plaintiffs commenced litigation to enjoin construction of the bridge in 1971. The facts surrounding the proposed construction, the administrative proceedings, and the litigation concerning it are fully set forth in the opinion of the district court presently under review, *Louisiana Environmental Society, Inc. v. Brinegar,* 513 F.Supp. 179 (W.D.La.1981), as well as in the prior reported decisions arising out of this litigation: *Coleman* (1976), *supra; Louisiana Environmental Society, Inc. v. Coleman,* 524 F.2d 930 (5th Cir.1975); *Louisiana Environmental Society, Inc. v. Brinegar,* 407 F.Supp. 1309 (W.D.La.1976).

In *Coleman* (1976), *supra,* this court found the Secretary's Section 4(f) determination deficient because it had not adequately balanced whether at least two of the alternative routes did less recreational harm to the lake than the route proposed by the Secretary for its crossing, and the case was remanded for the Secretary's balancing of the relevant considerations. 537 F.2d at 86–87.[2] The present appeal results from the district court's decision on the remand. 513 F.Supp. 179 (W.D.La.1981). Except for the issues potentially implicated by the attempted amendment through the third amended and supplemental complaint (*see* Part II of opinion below), it is fair to state that, by the time of trial below, the only remaining issue concerned the sufficiency of the reaffirmed Section 4(f) determination of December 5, 1978 by the Federal Highway Administrator that the proposed

route for the bridge (the "Adopted Line") minimized recreational harm equally to or more than the alternative C-Modified route for which the plaintiffs contend. 513 F.Supp. at 182.

Furthermore, as a result of the district court's non-erroneous determinations that the Administrator had properly found that "active" recreational harm and other impacts were approximately equal for both routes, for purposes of this appeal the threshold substantial issue is whether the district court erred in concluding that the Administrator's findings were insufficient to support his Section 4(f) determination approving the Adopted Line because, the Administrator found, the "passive" recreational harms of the C-Modified alternative would exceed those that would result from construction of the bridge on the proposed Adopted Line.[3]

### A.  *Standard of Review*

The standard of judicial review of the Administrator's Section 4(f) determination is summarized in *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Since no issue is here raised as to whether the Administrator acted within the scope of his authority, 401 U.S. at 415, 91 S.Ct. at 823, nor of any procedural irregularity, 401 U.S. at 417, 91 S.Ct. at 824, our present review involves only whether—upon the "whole" agency record before the Administrator, 401 U.S. at 419, 91 S.Ct. at 825—the Administrator's Section 4(f) finding was arbitrary, capricious, or an abuse of discretion. 401 U.S. at 416, 91 S.Ct. at 823.

In determining on judicial review whether the Administrator's choice was so

---

**2.** All of the plaintiffs' other attacks upon the proposed route were rejected by *Coleman* (1976), except that regarding an additional public hearing, 537 F.2d at 87–89. On the remand, the additional hearing was held, and this issue has passed out of the litigation.

**3.** An additional issue, which we do not reach since we ultimately affirm the Administrator's Section 4(f) determination, is whether, even if the C-Modified should be found to minimize the

harm (as compared to the Adopted Line), could the Administrator nevertheless properly have rejected the C-Modified route as imprudent, *Coleman, supra,* 537 F.2d at 87, because of the unduly great danger created by it to Shreveport's water supply (because a C-Modified bridge would pass close to the water intake valves used to supply Shreveport from the lake waters)?

flawed, the court must consider "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." 401 U.S. at 416, 91 S.Ct. at 824. In this regard, the Administrator's decision "is entitled to a presumption of regularity", although that presumption will not "shield his action from a thorough, probing, in-depth review." 401 U.S. at 415, 91 S.Ct. at 823. Although this judicial inquiry "into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 824.

██ The burden is on those parties attacking the agency's determination as arbitrary, capricious, or an abuse of discretion. *Ward v. Campbell,* 610 F.2d 231, 235 (5th Cir.1980). In applying that standard to review of the administrative determination, "the focal point for judicial review should be the administrative record already in existence [on the basis of which the administrator's determination was made], not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). Furthermore, since an appellate court reviews the administrative decision on the identical basis as did the district court, appellate court review need accord no particular deference to the district court's conclusion as to whether the identical administrative record does or does not support the administrative determination as reasonably based. *Brown v. United States Department of Interior,* 679 F.2d 747, 748–49 (8th Cir. 1982); *Washington State Farm Bureau v. Marshall,* 625 F.2d 296, 302 (9th Cir.1980); *Asarco, Inc. v. U.S. Environmental Protection Agency,* 616 F.2d 1153, 1161 (9th Cir. 1980).

B. *The Administrator's Section 4(f) Determination*

Pertinently, in *Coleman, supra,* the present case was remanded in order that the Administrator make the requisite Section 4(f) determination, upon "balancing of relevant considerations", whether one of several alternative routes did "less harm" than the Adopted Line to the recreational lake. 537 F.2d at 87. Following the remand, an additional hearing was held and additional reports were made, after which the Administrator reaffirmed his initial Section 4(f) determination that the Adopted Line, of all the alternatives, was least harmful to recreational aspects of lake use.

The bridge construction at issue is contemplated in aid of completion of the I–220 Shreveport bypass highway. The record adequately establishes, as held by the previous courts, that it is not feasible to construct the bypass without crossing at least part of the lake. The determinative issue, as finally distilled by prior proceedings, is whether the Adopted Line does less (or equal) harm to recreational value than would construction along the C-Modified route, one of the alternatives.

Cross Lake, the recreational site in question, has a surface area of nearly 9,000 acres lying immediately east of the Shreveport urban areas. The Adopted Line crosses the lake for a length of 8,600 feet and is situated approximately a mile west of the lake's eastern end. The C-Modified route skirts the eastern (or populated) shore of the lake and crosses it for only 2,100 feet at a small inlet on the eastern end. *See generally* map in *Coleman, supra,* 537 F.2d at 83.

After appropriate administrative proceedings, the Federal Highway Administrator on December 5, 1978 made his formal reaffirmed Section 4(f) determination that "the Adopted Line has the smallest impact on Cross Lake recreational activities" of the alternatives considered. Government Exhibit ("G.Ex.") 308. To this determination were attached a "4(f) Analysis" report dated August 1978 (G.Ex. 306) and an "Additional Information on the 4(f) Analysis" memorandum dated October 20, 1978 (G.Ex. 307). Upon remand by the district court to the Administrator to determine the nature of the attachments, the Administrator executed an affidavit that explained the attached documents. 513 F.Supp. at 181.

The Administrator stated that "[t]he two documents attached to my reaffirmation of December 5, 1978, were a significant part of the basis for my analysis and further discussed the findings I incorporated into my analysis. The information contained in these two attachments along with the advice of my staff and the information obtained in the administrative record all formed the basis for my Reaffirmation of December 5, 1978." R.V, 1636–37. The Administrator's determination also noted that a transcript of the public hearing held on November 22, 1977 (G.Ex. 304), was included as a part of the current evaluation.

The Administrator's Section 4(f) determination found that the Adopted Line did less harm than the C-Modified alternative primarily because of its lesser impact upon "[p]assive recreational activities along the shoreline", such as "picnicking, hiking, camping, and park usage."[4] The Administrator found that "[t]he visual impact is the dominant difference between the Adopted Line and the [C-Modified] corridor alternative. As the location which intrudes the least into visual experiences of the public and provides increased visual qualities to the greatest number of people, the Adopted Line can be accepted as the route which minimizes harm."

The Administrator found that the Adopted Line would have a negative impact on only 6,200 feet of shoreline as compared with the negative impact upon 14,000 feet of shoreline if the highway were constructed upon the C-Modified alternative. The Administrator explained negative impact in terms of the length of the shoreline along which the highway would form a dominant focus. He explained that the C-Modified highway construction would seriously infringe on the "view of the lake and activities on the lake" and "will impact persons walking and otherwise enjoying the recreational opportunities along the shoreline" fringing the C-Modified alternative. On the other hand, the "visual intrusion impacts" would be minimized with respect to the Adopted Line, one mile distant from the east end of the lake, since the intrusion is "lessened by moving away from the position of the viewer."[5]

The district court set aside the Administrator's Section 4(f) determination and remanded the matter to the Secretary of Transportation. The district court felt obliged to do so upon its conclusion that the Administrator's determination had inadequately balanced the respective passive recreational harms of the two routes. The court found

4. After hearing seven days of testimony, the district court likewise agreed that the passive-recreational and esthetic value aspects were the most substantial impact to the recreational area of Cross Lake, 513 F.Supp. at 183, and essentially agreed with the Administrator that the differences in such harm occasioned by the respective routes would be the determinative consideration in assaying the validity of the Section 4(f) determination.

5. The Administrator's statement in full, is:
The length of shoreline along which the highway would form a dominant focus is much greater with the C/C-Modified corridor alternative, negatively impacting 16,750 feet and 14,000 feet, respectively, as compared with the Adopted Line's impact on 6,200 feet of shoreline. Even with a highway as low as is consistent with other conditions, the view of the lake and activities on the lake by residents east of the highway will seriously be infringed upon. The same visual intrusion will impact persons walking or otherwise enjoying the recreational opportunities along the shoreline east of the C/C-Modified corridor alternative. Since these visual intrusion impacts are lessened by moving away from the position of the viewer, the Adopted Line with a distance of approximately 1 mile minimizes the visual impact for residents and shoreline visitors along the east end of the lake. A smaller number of residents on Willow Point and a shorter length of shoreline are visually impacted by the Adopted Line.
The Administrator's findings as to the relative seriousness of the impact of the two routes upon the residents and shoreline visitors is in the context of the earlier finding in his Section 4(f) determination, which is supported by the administrative record, that the population near the lake was concentrated in the "[d]eveloping areas of Shreveport [that] occupy[ied] both sides of the eastern one-third of the lake"— where, fringing the shoreline, the C-Modified alternative would be constructed—, whereas "[t]he remainder of the shoreline [across which the Adopted Line bridge would be constructed] is agricultural and forest land interspersed with low-density development."

no error in the Administrator's determination "that the only significant visual impact" created by the Adopted Line extended (as found by the Administrator) for the 6,200 feet from Willow Point east to the American Legion Home, 513 F.Supp. at 184, *see* Plaintiff's exhibit 324. Nevertheless, the district court concluded, the administrative record did not substantiate that the Adopted Line as compared with the C-Modified alternative, intruded (as found by the Administrator) the least into the "visual" experiences of the public and that it thus visually benefits "the greatest number of people". *See* Section 4(f) determination, G.Ex. 308, p. 5; 513 F.Supp. at 186.

The apparent basis for the district court's conclusion is that, as made clear by evidence received at the trial, some portion of the 14,000 feet that received negative impact throughout the C-Modified route was adversely affected—not by *visual* intrusions, but rather by the *limitation to the access* of this shoreline that would result from construction of a C-Modified limited access highway near the eastern lake shoreline that would block off streets in a settled subdivision. The district court felt that the administrative record supported the Administrator's finding that 14,000 linear feet of shoreline were adversely affected only if (as testified at trial) the negative impact on shoreline affected by C-Modified included both limitation of access as well as visual intrusion; however, it felt that the record reflected insufficient support for finding that limitation of access resulted in an adverse recreational impact. The court therefore concluded that the Administration's Section 4(f) determination, insofar as finding C-Modified caused more recreational harm than did the Adopted Line, was arbitrary, capricious, and an abuse of discretion. 513 F.Supp. at 187.

We differ with the district court. Considering the entire administrative record, we find that the Administrator's findings are sufficiently explained and support a valid Section 4(f) determination by him that the Adopted Line creates less passive-recreation impact than does the C-Modified

alternative and therefore justifies the Administrator's choice of it as the route for bridging Cross Lake.

The Administrator's description in his determination of this negative impact as "visual" is inaccurate (an inadvertent staff oversight, he claims). Nevertheless, in considering the attachments to his report, as well as the remainder of the administrative record, the plain reason for his choice of the Adopted Line as less harmful than the C-Modified alternative is that, in terms of passive recreational impact, the Adopted Line (built far in the lake west from the more populated areas) would be visually less intrusive to fewer people and would affect only 6,200 feet of shoreline, with practically no impact upon shoreline recreational use; whereas the C-Modified approach—to be constructed in a populated area—would affect 14,000 feet of shoreline, as being seriously intrusive visually to many more people and as having negative impact in terms of access for recreational activities to many more feet of shoreline.

This issue was, in fact, the determinative focus for evaluation of the passive-recreation harms created by the respective routes, commencing with the October, 1977 report prepared in advance of the public hearing, *see* G.Ex. 303A, pp. I–19–20, X–24–27, through the public hearing of November 22, 1977, *see* transcript thereof, G.Ex. 304, pp. I–25–26, 137–38. This was likewise the determinative focus in the August, 1978 Section 4(f) analysis, G.Ex. 306, attached to the Administrator's determination.

In comparing the alternatives, this August 1978 analysis, in Table 2, p. 5, notes in evaluating the respective routes on "[P]assive Recreation (observing nature, walking, and viewing lake)" that the Adopted Line affects 6,200 feet of lake shore whereas the C-Modified line affects 14,000 feet of lake shore—the same figures described in the Administrator's Section 4(f) determination as the passive recreational impact termed "visual". In comparing and evaluating the recreational impacts of the alternatives with regard to passive recreation, the analysis states

Passive recreation, such as observing nature, walking, or viewing the lake, will be affected directly by all of the lines where the bridge will touch each shore, and this effect will be the same for each line. However, all of the alternate lines [the Adopted Line] will impact passive recreation to a greater extent than the Adopted Line *because of the disruption of views and physical access resulting from their terrestrial alignments.* Whether or not an area was determined to be affected was based on whether the bridge was perceived as a part of the foreground or background. In those areas where the bridge was the dominant view and where it would appear to be a part of the foreground, the bridge was determined to be an impact on passive recreation. Where it was a background element of the view no impacts were assessed. Lines C and C-Modified are the most damaging to passive recreation due to the fact that they will impact approximately 16,750 feet and 14,000 feet of shoreline, respectively. Line B will impact recreation on approximately 7,250 feet of shoreline associated with Willow Point, while Line B–1 will impact a total of approximately 9,000 feet of shoreline on Willow Point and the north shore of Cross Lake. The Adopted Line will have less effect on passive recreation with only 6,200 feet of shoreline affected. None of the affected shoreline areas contain public parks, hiking trails, or any other public recreational facility.

Impacts on passive recreation are far more significant than is normally realized. A significant portion of the total number of man-days devoted to recreation. In addition, interference with passive recreation has more effect on the residents' perception of their "quality of life" than does interference with other types of recreation. *The manner in which the two C alignments interfere with the ability of large neighborhood areas to view the lake, walk along its edge, or have ready access to the lakeshore is a major impact on passive recreation.*

Pp. 4–8 (intervening charts 5–7) (emphasis added). To identical effect is the "Additional Information on the 4(f) Analysis" report of October 20, 1978, G.Ex. 307, which likewise was attached to the Administrator's Section 4(f) determination of the December 5, 1978 hearing under judicial review. *See* pp. 1–3, 11–12, and tables attached.

Based upon this administrative record, and according the Administrator's choice the requisite presumption of regularity, we cannot say that the Administrator's decision was not based "on a consideration of relevant factors", nor that it represented a "clear error of judgment", so as to be arbitrary, capricious, or an abuse of discretion. *Overton Park, supra,* 401 U.S. at 916, 91 S.Ct. at 824; *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). On judicial review, the courts may not disturb an administrative determination when, as here, a simple balancing process is involved, and where the administrator has reached a Section 4(f) choice on a rational basis after including the relevant considerations in his analysis. *Adler v. Lewis,* 675 F.2d 1085, 1092–95 (9th Cir. 1982).

Nor are we required to set aside the Administrator's Section 4(f) determination because of his inaccurate use of the term "visual" in describing and balancing the respective passive-recreation harms of the two routes. Judicial review is based upon the entire administrative record, *Overton Park, supra,* 401 U.S. at 419, 91 S.Ct. at 825, and the attachments to the determination upon which its conclusion was based plainly show that, while the Adopted Line's adverse effects on 6,200 feet of shoreline would result only from "visual" intrusion, the adverse effects on 14,000 feet of shoreline to be caused by the C-Modified route included *both* visual intrusion and the negative recreational impacts on shoreline use caused by loss of access. Though there be technical deficiencies, "even under the exacting § 4(f) requirements, the judicial branch may not 'fly speck' if it appears in

its review, that all factors and standards were considered." *Adler v. Lewis, supra,* 675 F.2d at 1095. While "[t]he agency must articulate a 'rational connection between the facts found and the choice made' ", and while the courts "may not supply a reasoned basis for the agency's action that the agency itself has not given", nevertheless, on judicial review, an administrative decision "of less than ideal clarity" will be upheld "if the agency's path may reasonably be discerned." *Bowman Transportation, Inc., supra,* 419 U.S. at 285–86, 95 S.Ct. at 442. Here, the Administrator's Section 4(f) determination meets that test.

Nor can we say that the seven days of testimony at the trial before the district court shows that the Administrator's determination was arbitrary or capricious or not rationally based. In arguing that the evidence shows the Administrator's methodology in determining relative harms was arbitrary and capricious the plaintiffs contend, inter alia, that the Administrator's criteria were overly subjective and incorrectly excluded from consideration (a) the adverse impact for people of a view of the bridge from distance greater than one mile and (b) certain areas of shoreline within view of an Adopted Line bridge because few people recreated in these areas.[6] While the plaintiffs couch their argument in terms of arbitrariness, their contentions actually involve an argument that urges the merits of a more preferable methodology espoused by them that should have been, they contend, used to measure the passive-recreation impacts of the respective routes.[7]

On judicial review, however, our court "is not empowered to substitute its judgment for that of the agency", *Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 814. Our function is limited to determining whether the Administrator's choice of methodology has a rational basis, consistently applied, that takes into account the relevant considerations. Finding that it does, we reverse the district court's holding that set aside the Administrator's Section 4(f) determination.

## II. *Appeal No. 82–3042*

■ After final judgment, the plaintiffs separately appealed from an interlocutory ruling by which the district court had sustained the defendant's motion to strike some twenty-three paragraphs of a third supplemented and amending petition filed by the plaintiffs. The substance of the ruling was to refuse the plaintiffs upon the remand to re-litigate matters earlier decided or to assert new causes of action beyond the scope of the remand.

6. The evidence upon which the plaintiffs rely is principally found in the testimony of Keith Price (a consultant who prepared the passive-recreation aspects of the 4(f) analysis, called by the plaintiffs on cross-examination, R.IX, pp. 144–96), of Larry Hubbard (the subcontractor responsible for preparation of the 4(f) analysis, R.XIX, pp. 1190–1255), and of Richard Smarsden (the plaintiffs' expert, R.X, pp. 208–87, R.XI, pp. 289–402, R.XII, pp. 405–93, and R.XIII, pp. 498–522).

The district court itself discounted on its merits the testimony of this latter witness with regard to the alleged greater visual impact of the Adopted Line bridge. 513 F.Supp. at 183–84. We ourselves had earlier recognized, in remanding in *Coleman, supra,* for a balancing of alternative lines that "the adopted route creates minimal visual distraction," but the C-Modified line "harm[s] the lake in that [it] cut[s] off its view by residents and visitors on the eastern side of the lake." 537 F.2d at 87.

7. The plaintiffs' most plausible argument of arbitrariness is their contention that the Administrator and his consultants failed to apply criteria "guidelines" contained in a 1979 booklet (published after the 1978 Section 4(f) determination here) sponsored by his agency, that had evolved from seminars held from 1977–79, entitled, "Seminar Notes, Esthetics and Visual Resource Management for Highways". G.Ex. 332. The plaintiff's particular complaint is that, under the criteria, some impact should be found to result to viewers more than a half-mile distant from a bridge. In the first place, the criteria furnished by these 1979 seminar notes, even if applicable to this 1978 administrative determination, do not on their face show that the Administrator's criteria of relative harm in visual impact of the two routes, under present circumstances was arbitrary or not rationally based. *See* Hubbard, R.XIX, 1227–34. Further, even if a view of the bridge in the "middle ground" (one-half to three miles) would under the criteria be considered to have an impact, for instance, it "would not necessarily be an adverse impact ... because it could actually blend in very definitely with the horizon line." *Id.,* p. 1254.

In the prior appeal, *Coleman, supra,* we had determined that there was no merit to any of the statutory bases then solely urged, 537 F.2d at 82, as a basis for enjoining construction of the bridge, *except* for an additional public hearing requirement (that is no longer an issue, *see* note 2 *supra*) and for a Section 4(f) determination. As to the latter, we remanded to the district court "with instructions to enjoin further construction pending the Secretary's compliance with § 4(f)." 537 F.2d at 82. The sole reason for the remand was that the Secretary had not made the requisite "balancing test" to determine which of the various routes would "keep harm to the lake to a minimum." 557 F.2d at 87.

In striking allegations stating new causes of action from this 1979 supplemental petition, the district court exercised its discretion to deny an amendment of the pleadings at this late stage. *In re Westec Corporation,* 434 F.2d 195, 203–04 (5th Cir.1970). This litigation had first been instituted in 1971, and *Coleman, supra,* had decided all issues previously urged, remanding in 1976 only for a further Section 4(f) determination. For reasons analogous to those that motivate the "law of the case" principle, *Morrow v. Dillard,* 580 F.2d 1284, 1289–91 (5th Cir.1978) (matters once decided expressly or by implication should not be relitigated on a remand), we find no abuse of the district court's discretion in refusing to permit the plaintiffs to amend so as to assert that routes whose rejection had been affirmed in *Coleman* should be reconsidered, or to assert, for the first time in 1979, that yet other routes should be considered (Pars. 52–54, stricken), or that the Water Pollution Control Act applied to construction of the bridge (Pars. 49(a), 56–58, 60, stricken).

As to the allegations concerning the alleged need for a new environmental impact statement (Paras. 61–67): The continuing duty to evaluate new information may indeed require a supplemental statement when "subsequent project changes can, in qualitative or quantitative terms, be classified as " 'major Federal actions *significantly* affecting the quality of the human envi-

ronment' ", *Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981) (emphasis added), or when "*significant* new information becomes available concerning the action's environmental aspects", 23 C.F.R. § 771.15 (as in effect in 1978). Here, however, the allegations for the need for a supplemental environmental study (*see* Par. 64, stricken) could reasonably have been deemed by the district court as setting forth information neither new nor significantly affecting the environmental aspects of the construction so as not to require a supplemental environmental study—at least for the purpose of exercising its discretion to permit amendment in 1979 to pleadings initially filed in 1971 and fully litigated through appeal in 1976, when remanded for the limited purpose of requiring the administrator to make an adequate Section 4(f) determination.

The plaintiffs have successfully enjoined the construction of the bridge since 1971, even though by the 1976 appeal all of their attacks were rejected except, pertinently, the requirement for a further Section 4(f) determination. To have permitted the amendments in 1979 upon this limited remand, implicated prolongation of the litigation for an additional length of time equivalent to that which had elapsed since institution of the suit, through the injection of new issues never before raised, or the resurrection of issues previously decided but allegedly revived because of the duration of the litigation—in part attributable to the plaintiffs' numerous and persistent and mostly unsuccessful attacks upon the project. Under these circumstances, and considering the limited purposes of the remand, we find no abuse of the district court's exercise of discretion, by its close scrutiny in denying amendment.

*Conclusion*

Accordingly, for the reasons stated:

(1) *In Appeal No. 81–3784,* we REVERSE the judgment of the district court that set aside the Section 4(f) determination made by the Federal Highway Administrator and that enjoined construction of the

proposed I–220 By-Pass along the Adopted Line, and we ENTER judgment dismissing the plaintiffs' suit with prejudice, all costs to be assessed against the plaintiffs-appellees; and

(2) *In Appeal No. 82–3042,* we AFFIRM the ruling of the district court that struck certain allegations from the plaintiffs' third supplemental and amending complaint, with costs to be assessed against the plaintiffs-appellants.

JUDGMENT REVERSED AND ENTERED IN ONE APPEAL; JUDGMENT AFFIRMED IN THE SECOND APPEAL.